# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

AEROSONIC LLC,

      Plaintiff,

v.

JOBY AERO, INC.,

      Defendant.

Case No. 8:25-CV-00554-VMC-AAS

## FIRST AMENDED COMPLAINT, INJUNCTIVE RELIEF SOUGHT, AND DEMAND FOR JURY TRIAL

Plaintiff Aerosonic LLC ("Aerosonic"), by its undersigned attorneys, alleges as follows:

## NATURE OF THE ACTION

1.     This is a civil action against Joby Aero, Inc. ("Joby") for breach of contract and misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), *et seq.* ("DTSA").  This action arises from Joby's breach of a Mutual Nondisclosure Agreement between Joby and Aerosonic ("MNDA") and from misappropriation of Aerosonic's trade secrets by Joby.

2.     Aerosonic seeks relief set forth in the prayer below, including (1) monetary and equitable relief due to wrongful breach of the MNDA by

Joby and unlawful misappropriation under the DTSA by Joby, and (2) a preliminary and a permanent injunction enjoining Joby from possessing, using, disclosing, or otherwise misappropriating Aerosonic's proprietary information.

## PARTIES

3.      Aerosonic is a Delaware limited liability company with its principal place of business at 1212 North Hercules Avenue, Clearwater, Florida.

4.      Aerosonic was founded in 1953 and has been headquartered in Clearwater, Florida since 1956.

5.      Aerosonic is a leader in aviation and avionics equipment, including air data systems, displays, instruments, sensors, and probes.

6.      Aerosonic's expertise is in "air data," i.e., the measurement of air pressure to output useful information that enables safe aircraft operation.

7.      Between 2013 and 2023, Aerosonic sold over 350,000 air data parts.  In that same time, Aerosonic's air data parts flew millions of flight hours.

NAI-5001478094v1

2

8. Aerosonic's customers include the United States military and many major manufacturers of civil, military, and business aircraft worldwide.

9. Aerosonic's portfolio of air data parts includes an extensive collection of air data probes capable of measuring pitot pressure, static pressure, angle of attack ("AoA"), angle of sideslip ("AoS"), and combinations thereof.

10. Aerosonic's air data parts are the result of extensive research and development refined by decades of experience.

11. Aerosonic develops and retains its own intellectual property related to the research, development, manufacture, calibration, and acceptance and qualification testing of its air data parts (Aerosonic's "Proprietary Information").

12. Joby is a Delaware corporation with its principal place of business at 333 Encinal Street, Santa Cruz, California. Joby is a wholly owned subsidiary of Joby Aviation, Inc.

13. Joby is developing electric vertical takeoff and landing ("eVTOL") aircraft.

14. Joby seeks to mass-produce aircraft and create a global passenger service.

15.    To date, Joby and its affiliates have raised over two billion dollars through investments from and partnerships with Toyota Motor Corporation, Delta Air Lines, Inc., Uber Technologies, Inc., and others.

16.    Joby has attempted to prototype and manufacture air data parts in house, but Joby has also relied on outside suppliers in the past.

17.    Prior to 2022, Joby had not attempted to design, develop, test, calibrate, or manufacture air data probes.

18.    At various times, Joby wanted Aerosonic to supply air data probes that were capable of measuring pitot pressure, static pressure, angle of attack, and angle of sideslip for Joby's flight-test aircraft and eventual mass-production aircraft.

## FACTUAL ALLEGATIONS

**The Mutual Nondisclosure Agreement**

19.    Aerosonic and Joby executed the MNDA so each company could "evaluate internally a potential business relationship" with the other. A true and correct copy of the MNDA is attached to this Complaint as Exhibit 1.

20.    Joby signed the MNDA through its Supply Chain Lead James Ward.  Aerosonic also signed the MNDA.  The MNDA is dated September 21, 2021.

21. The MNDA applies to "Proprietary Information," defined as "information relating to [Aerosonic's and Joby's businesses] (including, without limitation, computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics and other technical, business, financial, customer and product development plans, forecasts, strategies and information)."

22. The MNDA further states that Proprietary Information is that which is (1) "disclosed in a tangible form" and "conspicuously marked 'Confidential', 'Proprietary' or the like," (2) "disclosed in a non-tangible form and identified as confidential at the time of disclosure," or (3) of a nature and disclosed in a manner "such that a reasonable person would understand it to be confidential." The MNDA does not require Proprietary Information to be marked.

23. The MNDA requires each party to (1) hold the other party's Proprietary Information "in strict confidence and [] take reasonable precautions to protect such Proprietary Information," (2) "not [] divulge any such Proprietary information or any information derived therefrom to any third person, except its own employees who have a need to know for the purposes contemplated herein," (3) "not make any use whatsoever at any time of such Proprietary Information except to evaluate internally a potential business relationship," (4) "not copy or reverse engineer any such

Proprietary Information," and (5) "not export or reexport (within the meaning of U.S. or other export control laws or regulations) any such Proprietary Information or product thereof."

24. The MNDA applies to Proprietary Information "previously, presently, or subsequently disclosed," so long as the disclosure was "made before the second anniversary of this Agreement."

25. By its terms, the MNDA applies retroactively to all disclosures between Aerosonic and Joby that predated the MNDA and prospectively to all disclosures made by Aerosonic and Joby at or after execution of the MNDA and prior to the second anniversary on September 21, 2023.

26. Aerosonic did not make any disclosures on or after September 21, 2023, so all of Aerosonic's disclosures are protected by the MNDA.

27. The MNDA is still in effect.

28. Aerosonic's disclosures remain subject to the MNDA.

29. Joby drafted the MNDA.

30. Joby has failed to comply with the terms of the MNDA.

31. Specifically, Joby used Aerosonic's Proprietary Information to prototype and manufacture air data probes, which constitutes use for purposes other than "to evaluate internally a potential business relationship."

32. In breach of the MNDA, Joby reverse engineered Aerosonic's Proprietary Information.

33. In breach of the MNDA, Joby copied Aerosonic's Proprietary Information.

34. Joby's actions constitute breach of the MNDA and misappropriation under the DTSA.

**Proprietary Information and Trade Secrets Disclosed by Aerosonic to Joby**

35. Aerosonic owns valuable trade secrets related to the design, development, calibration, testing, manufacturing, and other technical aspects of its air data probes. Aerosonic's trade secrets include the particular and specific designs, critical dimensions, critical tolerances, aerodynamic ratios of probe dimensions, materials, thermal management technology, test data, test procedures and/or reports (for calibration and for acceptance and qualification), and related technologies for Aerosonic's air data probes.

36. With respect to dimensions and tolerances, Aerosonic's trade secrets include the following: (1) the dimensions and tolerances of the orientation of AoA ports on Aerosonic's air data probes; (2) the dimensions and tolerances of the orientation of AoS ports on Aerosonic's air data probes; (3) the dimensions and tolerances for the AoA and AoS port size

for Aerosonic's air data probes; (4) the dimensions and tolerances of the probe sleeve diameter for Aerosonic's air data probes; (5) the dimensions and tolerances of the probe length for Aerosonic's air data probes; (6) the dimensions and tolerances of the static port axial location for Aerosonic's air data probes; (7) the dimensions and tolerances of the probe height for Aerosonic's air data probes; (8) the dimensions and tolerances for the pitot port size of Aerosonic's air data probes; (9) the dimensions and tolerances for the axial location of the static ports for Aerosonic's air data probes; (10) the dimensions and tolerances for the axial location of the AoA and AoS ports on Aerosonic's air data probes; and (11) the dimensions and tolerances for the mast maximum thickness of Aerosonic's air data probes.

37.    With respect to aerodynamic ratios of probe dimensions, Aerosonic's trade secrets include: (1) ratio of probe sleeve diameter versus distance from the probe tip to the static hole ring; (2) ratio of maximum thickness versus the distance from the mast leading edge to the static hole ring; (3) the ratio of probe length versus probe sleeve diameter; (4) ratio of pitot inlet diameter versus probe sleeve diameter; and (5) ratio of AoA and AoS axial location versus probe sleeve diameter.

38.    Aerosonic's trade secrets also include the design of the pitot chamber, including the internal geometry.

39.    Aerosonic's trade secrets further include the specific, distinct geometric design of the interface side of Aerosonic's integrated air data probes, which is not observable while the probe is in service on an aircraft.

40.    Aerosonic's trade secrets also include its Acceptance Test Procedures, Qualification Test Procedures, Qualification Test Reports, First Article Inspection Reports, 2D drawings, 3D models, wind tunnel data, and other data, procedures, and technical information necessary to qualify Aerosonic's air data probes for use.

41.    Aerosonic's trade secrets also constitute Proprietary Information under the MNDA, because each trade secret is (1) "disclosed in a tangible form" and "conspicuously marked 'Confidential', 'Proprietary' or the like," (2) "disclosed in a non-tangible form and identified as confidential at the time of disclosure," or (3) of a nature and disclosed in a manner "such that a reasonable person would understand it to be confidential."

42.    Aerosonic provided trade secrets and Proprietary Information regarding its air data parts to Joby in (1) engineering drawings, (2) 3D models, (3) loaner units of Aerosonic's air data parts, (4) units of Aerosonic's air data parts that Joby purchased, (5) calibration, acceptance and qualification test procedures and/or reports, (6) wind tunnel data,

NAI-5001478094v1

(7) other technical documentation and manuals, (8) written communications, and (9) verbal communications.

43. As required by the MNDA, all Proprietary Information that Aerosonic disclosed to Joby was marked or identified as such or was of a nature and disclosed in a manner such that a reasonable person would understand it to be confidential.

44. Every page of every engineering drawing that Aerosonic disclosed to Joby contained the following "Aerosonic Proprietary Notice:" "THIS DOCUMENT CONTAINS PROPRIETARY AND TRADE SECRET INFORMATION SUBJECT TO 18 U.S.C. 1831-1839, PROTECTION OF TRADE SECRETS, AND THE UNIFORM TRADE SECRETS ACT. ANY USE OR DISCLOSURE WITHOUT THE EXPRESS WRITTEN AUTHORITY OF AEROSONIC® WILL RESULT IN CIVIL AND CRIMINAL PROSECUTION. THE ENTIRE CONTENT OF THIS DRAWING IS SUBJECT TO THIS PROPRIETARY NOTICE."

45. Aerosonic's engineering drawings contain Aerosonic's trade secrets and Proprietary Information because, among other reasons, the engineering drawings contain the designs, materials, dimensions, and tolerances used to manufacture and calibrate Aerosonic's air data parts.

46. The designs, materials, and dimensions in Aerosonic's engineering drawings determine the aerodynamic performance and

NAI-5001478094v1

10

measurement capabilities of Aerosonic's air data parts. Even small changes to an air data part's design, materials, or dimensions can significantly change the aerodynamic performance and measurement capabilities of the air data part, which can require redoing the calibration and the acceptance and qualification testing and could significantly hinder or outright ruin the aerodynamic performance and measurement capabilities of the air data part.

47.   The tolerances in Aerosonic's engineering drawings represent narrow ranges of permissible variation that provide an air data part its unique aerodynamic performance and measurement capabilities.

48.   For dimensions as large as several inches or even several feet in length, the tolerances in Aerosonic's engineering drawings are generally on the order of tenths of a degree and hundredths or thousandths of an inch.

49.   Extensive research and development went into Aerosonic's tolerances. If Aerosonic's tolerances were too large, many of its air data parts would not function properly because their aerodynamic performance and measurement capabilities would not be as intended. If Aerosonic's tolerances were too small, the cost of manufacturing Aerosonic's air data parts would skyrocket because the cost of manufacturing air data parts increases as tolerances are reduced.

50.    Aerosonic's trade secrets differ from what is generally known in the industry by providing unique performance data, techniques, and values not known by Aerosonic's competitors or others, including unique air data signatures and aerodynamic performances, and measurement capabilities for air data probes.  Aerosonic's trade secrets are not known in the trade, and they are not readily ascertainable by proper means by persons of skill in the trade, by another person who can obtain economic value from the disclosure or use of the information, or by others. Aerosonic's trade secrets cannot be learned and replicated without learning them from Aerosonic, demonstrating that the trade secrets are not readily ascertainable.  Nor can Aerosonic's trade secrets, such as tolerances, be readily ascertained from the probes themselves, including by observation or measurement.  Consistent with Aerosonic's security measures for guarding its trade secrets, Aerosonic cannot identify the trade secrets further in this publicly filed complaint, but Aerosonic will further identify its asserted trade secrets upon entry of a suitable court protective order.

51.    A party who misappropriates Aerosonic's trade secrets could manufacture air data probes without incurring the expense of years of research and development—based on decades of experience—that Aerosonic invested in the development of its air data parts, and without

performing the calibration and the acceptance and qualification test procedures for a given air data probe design.

52. The MNDA prohibits Joby from copying or reverse engineering Aerosonic's Proprietary Information.

53. Joby misappropriated Aerosonic's Proprietary Information and trade secrets.

**Aerosonic's Course of Dealing with Joby**

54. Air data parts, including Aerosonic's air data probes, require significant time, money, and expertise to research, develop, manufacture, calibrate, acceptance test, and qualify.

55. On information and belief, prior to its dealings with Aerosonic, Joby had never attempted to design, develop, manufacture, calibrate, test, or qualify a flight-suitable air data probe.

56. Functional, flight-suitable air data probes are necessary for Joby's prototype and production aircraft.

57. Rather than incur the expense of research and development themselves, Joby reached out to air data parts suppliers to find an air data parts supplier for its aircraft.

58. Beginning in 2016, Joby first reached out to Aerosonic to see whether Aerosonic could supply air data parts for Joby's aircraft.

59.     Among other air data parts, Joby was interested in Aerosonic's air data probes.

60.     On February 11, 2019, Aerosonic's Sales Manager Cory Tellbuescher spoke with Maxine Nelson, Senior Systems Engineer at Joby, regarding Aerosonic's air data parts.  In a follow-up email that same day, Mr. Tellbuescher sent Ms. Nelson engineering drawings for Aerosonic's (1) quad-port air data system and related multi-function air data probe, (2) mini air data computer, (3) heated angle of attack sensor, (4) heated pitot air data probe, and (5) heated static port.

61.     Engineering drawings that Mr. Tellbuescher sent to Ms. Nelson on February 11, 2019, contained Aerosonic's proprietary notice, expressly prohibiting their disclosure or use.

62.     On October 29, 2019, Sedale Saunders, at the time a Sales Manager at Aerosonic, spoke with Kevin O'Connor, Flight Electronics Lead at Joby, regarding Aerosonic's air data parts.

63.     In an email on October 31, 2019, Mr. Saunders provided Mr. O'Connor with information regarding Aerosonic's air data probes, an engineering drawing for Aerosonic's air temperature sensor, a serial interface control document for Aerosonic's quad-port air data computer, and a quote for Aerosonic's air data parts.

64.    The engineering drawing that Mr. Saunders sent to Mr. O'Connor on October 31, 2019, contained Aerosonic's proprietary notice, and expressly prohibiting their disclosure or use.

65.    In 2020, Mr. Saunders and Mr. O'Connor spoke multiple times regarding Aerosonic's air data parts.

66.    By 2020, Joby was primarily interested in Aerosonic's SLZ8400 and SLZ8420 air data probes.

67.    In 2020, Joby requested and Aerosonic provided multiple forms of Aerosonic Proprietary Information to Joby, including, but not limited to, engineering drawings, 3D models, air data probe test procedure data sheets, and a loaner air data probe for Joby to evaluate for inclusion on Joby's flight-test aircraft and mass-production aircraft.  The drawings for this information were marked with Aerosonic's proprietary notice, expressly prohibiting their disclosure or use.

68.    In September 2021, Joby traveled to Clearwater, Florida in this District in furtherance of its evaluation of a potential business relationship with Aerosonic.

**Joby's Visit to Clearwater, Florida**

69.    On September 22, 2021, the day after executing the MNDA, Joby personnel met with Aerosonic personnel at the Island Way Grill at

20 Island Way, Clearwater, Florida 33767, where Joby and Aerosonic personnel discussed industry information.

70. On September 23, 2021, Joby visited Aerosonic's headquarters in Clearwater, Florida to meet with Aerosonic and to learn more about Aerosonic's air data parts.

71. The meeting agenda was as follows: "Joby arrival on-site at Aerosonic" (9:00 a.m.), "Sign in, Meet & Greet" (9:00 a.m. – 9:30 a.m.), "Tour of Aerosonic Production Facilities" (9:30 a.m. – 10:30 a.m.), "Technical discussions of RFP contents" (10:30 a.m. – 12:00 p.m.), "Lunch" (12:00 p.m. – 1:00 p.m.), and "Wrap up Technical discussions" (1:00 p.m. – 2:00 p.m.).

72. Five Joby employees traveled to Clearwater, Florida in this District to meet with Aerosonic in person: (1) Samuel Otu-Amoah (Program Manager, Avionics & Flight Sensors), (2) Kevin O'Connor (Flight Electronics Lead), (3) Charly Calles (Flight Sensors Project Engineer), (4) Christos Bais (Avionics & Flight Sensors Development Advisor), and (5) David Young (Commodity Manager).

73. Four Joby representatives participated in the technical discussions via Zoom videoconference: (1) Didier Papadopoulos (Head of Programs & Systems Engineering), (2) Edward Kikta (Integrated Flight & Propulsion Controls System Project Engineer), (3) Matt Stich (Purchasing

& Supply Chain at Toyota Flight Mobility), and (4) Eric Ohmit (Air Data SME Contractor).

74.     The technical discussions took place in the Learning Center conference room at Aerosonic's headquarters in Clearwater, Florida.

75.     The evening after Joby visited Aerosonic's headquarters, Mr. O'Connor sent an email to Aerosonic that included the following message: "[t]hank you again for hosting us, we appreciated the hospitality and engaged discussions that we had over the last 24 hours.  There was a lot we hashed out today and we thought the conversations were fruitful.  It was helpful for us to get insight into your facilities and capabilities; we are impressed overall."  The email also requested a preliminary response against Joby's Request for Proposal by end of the day Friday September 24, particularly surrounding the details of the long-term plan.

**Aerosonic's Course of Dealing with Joby After Joby's Visit to Clearwater, Florida**

76.     As part of the evaluation of the business relationship, Aerosonic made disclosures of trade secrets to Joby, including in Acceptance Test Procedures, Acceptance Test Reports, Qualification Test Procedures, Qualification Test Reports, First Article Inspection Reports, 3D models, 2D drawings, and wind tunnel data.

77.    Most of this information was not previously disclosed to Joby before the Clearwater meeting.  For example, Aerosonic disclosed the Acceptance Test Reports, Qualification Test Procedures, Qualification Test Reports (including the EMI Report and Environmental Report), the First Article Inspection Reports, the 3D models related to the SLZ8400, and the related wind tunnel data for the first time following the Clearwater meeting.

78.    After Joby visited Clearwater, Florida and Aerosonic's headquarters in Clearwater, Joby acted with urgency to purchase air data probes from Aerosonic.

79.    In 2021 and 2022, Joby was primarily interested in Aerosonic's SLZ8400-2, SLZ8420, and BB3 air data probes.

80.    On September 24, 2021, Aerosonic answered Joby's request for a preliminary response to its RFP.

81.    On Saturday, September 25, 2021, Mr. O'Connor sent an email to Aerosonic addressing Aerosonic's preliminary response and "request[ing] a formal quote for the short-term units" of Aerosonic's air data probes.

82.    On September 27, 2021, Aerosonic sent Joby a formal quote for the sale of one air temperature sensor, six SLZ8420-2 air data probes, and six SLZ8420-1 air data computers.

83.    On October 13, 2021, Joby's Global Commodity Manager David Young sent Aerosonic a formal purchase order to purchase quantity 4 (2 Left and 2 Right) SLZ8400-2 Air Data Probes.

84.    Aerosonic fulfilled Joby's first formal purchase order in early April 2022 with delivery of two left probes and two right probes.

85.    In furtherance of the potential business relationship, along with the probe shipments, Aerosonic made additional disclosures by attaching supporting Shipping Documents, including trade secret Test Data.

86.    Aerosonic disclosed this Test Data pursuant to the MNDA for the limited purpose of Joby's evaluation of a potential business relationship with Aerosonic.  Therefore, Joby's use of this information for any other purpose was prohibited under the MNDA.

87.    The SLZ8400-2 air data probes are not commercial off-the-shelf products that Joby could have purchased from Aerosonic.  Aerosonic offered these probes to Joby in connection with the potential business relationship between Aerosonic and Joby, custom-tailored the specifications of the SLZ8400-2 probes to fit Joby's needs, and subject to the terms of the MNDA.

88. Within days of the first probe delivered from Aerosonic, Joby asked Mr. Saunders if Joby could purchase the intellectual property rights to Aerosonic's air data probes, but Aerosonic refused.

89. Unbeknownst to Aerosonic, in April 2022 Joby decided to design and develop air data probes in house.

90. Joby did not tell Aerosonic that it had begun designing and developing air data probes in house.

91. Instead, Joby continued to engage with Aerosonic about a potential business relationship and to solicit confidential, proprietary, and trade secret information about air data probes from Aerosonic.

92. Joby continued to solicit Aerosonic's confidential, proprietary, and trade secret information until Joby stopped communicating with Aerosonic in 2023.

93. When Joby decided to design and develop air data probes in house in April 2022, the MNDA remained in effect.

94. In 2022 and 2023, unaware of Joby's intention to develop and design air data probes, Aerosonic continued to supply engineering drawings, 3D models, wind tunnel test data, air data probe test procedures and/or reports, and other technical documentation and manuals to Joby in accordance with the MNDA, and under the belief that Joby still intended to

pursue a business relationship.  This information included Aerosonic's trade secrets and Proprietary Information.

95.    Despite not telling Aerosonic that Joby decided to develop air data probes in April 2022, Joby sought to purchase additional air data probes from Aerosonic.

96.    After receiving the first four air data probes Joby purchased, on April 25, 2022, Mr. Young sent an email with the subject line "Additional Probes?" to Aerosonic that asked, "is there a potential to purchase a quantity to support our prototype build later this year?" Mr. Young's email also asked for a formal quote from Aerosonic for the additional air data probes.

97.    On May 5, 2022, Aerosonic provided Joby with a formal quote for the sale of additional air data probes.

98.    Joby responded with a second formal purchase order.

99.    Aerosonic fulfilled Joby's second formal purchase order.

100.    Like Joby's prior purchase, Aerosonic also provided Joby additional disclosures of trade secret Test Data and First Article Inspection Reports for these probes pursuant to the MNDA for the limited purpose of Joby's evaluation of a potential business relationship.  Therefore, this information remained protected under the MNDA and Joby is prohibited from using it for any other purpose.

101.    Joby and Aerosonic remained in close contact until 2023, when Joby stopped communicating with Aerosonic.

102.    Joby's purchase of the ten SLZ8400-2L/SLZ8400-2R air data probes was subject to Aerosonic's Sales Terms and Conditions, which (similar to the MNDA) protects the confidentiality of Aerosonic's Proprietary Information and prevent the copying thereof.

103.    Aerosonic's Sales Terms and Conditions prohibit Joby from "reverse engineer[ing], disassembl[ing] or otherwise deriv[ing] any intellectual property embedded in" the purchased probes.

104.    Aerosonic delivered the ten SLZ8400-2L/SLZ8400-2R air data probes to Joby in 2022 and 2023.

105.    Aerosonic's sale of SLZ8400-2L/SLZ8400-2R air data probes to Joby in California constitutes sales of product, made using Aerosonic's trade secrets, in interstate commerce.

106.    During an engineering discussion in early 2023, Joby engineers told Aerosonic that Aerosonic's air data probes were selected for Joby's mass-production aircraft.  Joby's statement directly contradicted its then-undisclosed intention to design and develop air data probes in house.

107.    Shortly thereafter, Joby stopped communicating with Aerosonic.

108.    Joby did not purchase any more air data parts from Aerosonic.

**Joby's Breach of the Mutual Nondisclosure Agreement and Joby's Misappropriation under the DTSA**

109.   In 2024, Aerosonic reasonably first discovered that Joby was using Aerosonic's Proprietary Information to manufacture air data probes.

110.   Aerosonic has since learned that in April 2022, Joby decided to develop air data probes in-house without telling Aerosonic.

111.   By March 2024—less than two years after deciding to develop air data probes—Joby apparently successfully designed, developed, calibrated, tested, and manufactured at least three flight-suitable air data probes sufficient for testing purposes and use on one of its eVTOL aircraft.

112.   During this period from April 2022 to March 2024, while secretly developing air data probes, Joby continued to solicit trade secret information from Aerosonic, continued to purchase air data probes from Aerosonic, and had continued access to and possession of Aerosonic's trade secrets and Proprietary Information.

113.   Based on Aerosonic's decades of experience with air data probes, the design, development, calibration, testing, qualification, and manufacturing necessary to produce a flight-suitable air data probe from scratch involves a significant investment of time, money, resources, and expertise.  To do so from scratch and without prior experience would likely have taken a decade or more and millions of dollars of investment.

114. On information and belief, the reason Joby engaged with Aerosonic and offered to buy Aerosonic's IP was to avoid the substantial investment of time, money, and resources associated with developing air data probes from scratch.

115. On information and belief, Joby did not have prior experience designing, developing, testing, certifying, and manufacturing air data probes.

116. Nevertheless, Joby apparently managed to design, develop, calibrate, test, qualify, and manufacture a flight-suitable air data probe less than two years after deciding to do so in April 2022, and less than a year after ceasing communications with Aerosonic in 2023.

117. The Aerosonic trade secrets and Proprietary Information that Joby acquired during the course of dealing with Aerosonic since 2016 contain information that, when used, would allow Joby to design, develop, calibrate, test, qualify, and manufacture a flight-suitable air data probe in a fraction of the time it would take to do so from scratch. Joby had continued access to this information when it decided to develop air data probes in April 2022.

118. Joby could not have designed, developed, calibrated, tested, qualified, and manufactured a flight-suitable air data probe from scratch in

less than two years without the head start it gained by using Aerosonic's trade secrets and Proprietary Information.

119. The design, location, operation, and orientation of Joby's air data probes are derived from Aerosonic's trade secrets and Proprietary Information.

120. The dimensions, tolerances, and internal design features of Joby's air data probes are derived from Aerosonic's trade secrets and Proprietary Information.

121. At least as of April 2022, Joby was using Aerosonic's trade secrets and Proprietary Information to design and develop air data probes without Aerosonic's consent and in violation of the MNDA.

122. Joby never informed Aerosonic that it planned to develop air data probes, and Aerosonic never consented to Joby using Aerosonic's information to develop air data probes.

123. As of June 16, 2025, Joby has manufactured at least seven aircraft.

124. Each aircraft that Joby has manufactured has three air data probes.

125. Not including a crashed aircraft from February 2022, Joby's fleet consists of at least seven aircraft that have the following N-Numbers registered with the United States Federal Aviation Administration ("FAA"):

(1) N541JA, (2) N542BJ (3) N5421A, (4) N541JX, (5) N542JX, (6) N544JX, (7) N545JX.  The last five aircraft are considered "production prototypes" by Joby according to Joby's public disclosures – these five aircraft use Aerosonic's trade secrets in the air data probes.

126.   The FAA's N-Number Inquiry lists "JOBY AERO INC" as the manufacturer and owner of all seven aircraft and lists one of the aircraft as manufactured in 2017, one of the aircraft as manufactured in 2021, one of the aircraft as manufactured in 2022, three of the aircraft as manufactured in 2024, and one of the aircraft as manufactured in 2025.

127.   According to Joby's public press releases, two of Joby's aircraft are eVTOLs that Joby delivered to Edwards Air Force Base as part of a Department of Defense Contract valued up to $131 million.

128.   According to a public press release from Joby dated April 25, 2023, Joby's contract with the Department of Defense has included at least three extensions and, "[a]s part of the agreement, Joby will deliver and operate up to nine" of its aircraft to the United States Air Force.

129.   In regard to the five most recent "production prototype" aircraft in its fleet, Joby has at least fifteen air data probes installed on these aircraft, while Aerosonic has only delivered ten air data probes to Joby.

130.    Aerosonic provided a total of ten air data probes to Joby, plus an early prototype loaner that was returned to Aerosonic.

131.    Joby has manufactured air data probes by misusing and misappropriating Aerosonic's Proprietary Information and trade secrets, in breach of the MNDA and in violation of the DTSA.

132.    According to Joby's public press releases, Joby announced its "plans to build [a] facility capable of delivering up to 500 aircraft per year" in Dayton, Ohio on September 18, 2023, and "the expansion of its Pilot Production Line in Marina, California" to "more than double Joby's manufacturing footprint at the Marina Municipal Airport" on April 29, 2024.

133.    According to Joby's public press releases, Joby also has a contract with the United States Department of Defense to deliver two eVTOL aircraft to MacDill Air Force Base in Tampa, Florida for testing on base and in the surrounding area.

134.    Publicly available videos on Joby's website and on various YouTube channels have shown use of Aerosonic's Proprietary Information and trade secrets in air data probes on Joby's aircraft without Aerosonic's consent.

135.    Aerosonic does not premise its claims on the similar look of the external features between Joby and Aerosonic's air data probes alone.

Conversely, Joby's use of Aerosonic's trade secrets is shown by, among other things, Joby's remarkably short development time of its similarly-designed own air data probes, despite no prior experience, all while having access to Aerosonic's trade secrets and continuing to solicit Aerosonic's trade secrets after deciding to develop probes without telling Aerosonic.

136. Aerosonic further discovered evidence showing that non-external design elements of Joby's air data probes matched Aerosonic's air data probes.

137. Around June 24, 2024, Aerosonic discovered a YouTube video showing a walkthrough of Joby's production factory. That video showed one of Joby's integrated air data probes unattached to an aircraft.

138. Because Joby's probe was unattached from an aircraft, the video showed the mating interface side of Joby's probe. The mating interface side of an integrated probe is not normally visible when the probe is mounted to the aircraft.

139. The video showed that the interface of Joby's integrated air data probe has the same distinctive geometric design as the interface for Aerosonic's integrated air data probe—specifically, Aerosonic's BB3 air data probe.

140. The geometric design of the interface of Aerosonic's integrated air data probe is Aerosonic's trade secret, is not readily observable when

mounted on an aircraft, and was included in the engineering drawings and other confidential disclosures Aerosonic made to Joby.

141.   Joby's matching geometric design of its integrated air data probe interface cannot be explained by coincidence or merely copying external and observable features.  The distinct design of Aerosonic's integrated air data probe is not readily observable.  This match shows, as just one example, that Joby did not independently develop its air data probes, but instead used Aerosonic's trade secrets and Proprietary Information to do so.

142.   After Aerosonic raised this video to Joby's attention in a cease-and-desist letter, the video was later edited to remove frames showing Joby's integrated air data probe.

143.   Joby has breached and continues to breach the MNDA, including by using Aerosonic's Proprietary Information and trade secrets for reasons other than "evaluating internally a potential business relationship" with Aerosonic.

144.   Joby is wrongfully using Aerosonic's Proprietary Information and trade secrets to manufacture air data probes at least for the development of its flight-test aircraft and mass-production aircraft.

145.   On July 31, 2024, Aerosonic expressly requested that Joby immediately return all Aerosonic confidential and proprietary information

in Joby's possession, which Joby is required to do upon request under Section 3 of the MNDA.

146.   Aerosonic reiterated its request that Joby turn over Aerosonic's Proprietary Information on December 5, 2024, April 11, 2025, May 16, 2025, and June 7, 2025.

147.   To date, and despite additional requests, Joby has not turned over Aerosonic's Proprietary Information.

148.   Instead, Joby has confirmed its continued use of Aerosonic's trade secrets, including refusing to return Aerosonic's information because Joby continues to use Aerosonic's "acceptance, qualification, and testing reports and data."

## JURISDICTION AND VENUE

149.   This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Aerosonic's claim arises under the DTSA, 18 U.S.C. § 1836(b), *et seq.*  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Aerosonic's claim for breach of contract forms part of the same case or controversy as Aerosonic's DTSA claim.

150.   This Court has personal jurisdiction over Joby because Joby has sufficient minimum contacts with the forum state that are related to

the present action, and because exercising personal jurisdiction over Joby is fair and reasonable under the circumstances.

151.    In its course of dealing with Aerosonic from 2016 to 2024, Joby frequently contacted Aerosonic's employees in Florida, knowing that Aerosonic's employees were in Florida, to conduct business via Zoom videoconferencing, phone, email, and written communications.  Over 800 emails were exchanged between Aerosonic (in Florida) and Joby during this time.  In Joby's emails, phone calls, videoconferences, and written communications to Aerosonic, Joby solicited Aerosonic's Proprietary Information from Aerosonic.  Aerosonic's headquarters are in Florida, all the Aerosonic employees that Joby conducted business with are in Florida, and Joby signed the MNDA two days before Joby employees visited (in person and via a Zoom videoconference) Aerosonic's headquarters in Clearwater, Florida for the purposes of acquiring Aerosonic's Proprietary Information.  Joby has contracts with the United States Department of Defense to deliver eVTOL aircraft (which use Aerosonic's trade secrets and Proprietary Information) to MacDill Air Force Base in this District.  Joby's substantial and directed contacts with Florida support the exercise of personal jurisdiction over Joby in this District.  As set forth in paragraphs 68–75 above, Joby personnel visited Clearwater, Florida on September 22, 2021, and September 23, 2021, to meet with Aerosonic personnel.

152.   Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the present action took place in the District.  As mentioned directly above, Joby frequently contacted Aerosonic's employees in Clearwater, Florida to conduct business and solicit Aerosonic's Proprietary Information, and Joby signed the MNDA two days before its representatives visited Aerosonic in Clearwater, Florida to further solicit Aerosonic's Proprietary Information.

## COUNT I

## BREACH OF CONTRACT

## (Against Joby Aero, Inc.)

153.   The MNDA is a written, valid, enforceable, and binding agreement, supported by adequate consideration, for the exchange of Proprietary Information to evaluate internally a potential business relationship between Aerosonic and Joby.  Because of its retroactivity and prospective applicability, the MNDA was in effect at all relevant times.  A true and correct copy of the MNDA is attached as Exhibit 1.

154.   Aerosonic performed all obligations required of it under the MNDA.

155.   By its actions set forth herein, Joby breached its duties under the MNDA.  Joby's breaches include, without limitation, Joby's use of Aerosonic's Proprietary Information, including the information described

in paragraphs 11, 35 through 41, 45, and 46, not to "evaluate internally a potential business relationship" with Aerosonic, but to copy and reverse-engineer Aerosonic's air data probes and use Aerosonic's Proprietary Information to manufacture air data probes.

156.    Joby has further breached Section 3 of the MNDA by failing to immediately turn over Aerosonic's Proprietary Information, despite Aerosonic's repeated and express requests in writing.

157.    As the direct and proximate result of Joby's breach, Aerosonic has suffered significant damages in an amount to be proven at trial.

158.    Aerosonic is entitled to recover damages flowing from Joby's breach of the MNDA, and any other remedy available under law.

159.    Aerosonic is also entitled to equitable relief.  In relevant part, the MNDA states that "due to the unique nature of the Disclosing Party's Proprietary Information, there can be no adequate remedy at law for any breach of its obligations hereunder, which breach would result in irreparable harm to the Disclosing Party, and therefore, that upon any such breach or any threat thereof, the Disclosing Party shall be entitled to appropriate equitable relief, without the requirement of posting a bond, in addition to whatever remedies it might have at law."

160.    Aerosonic is also entitled to specific performance.

161.    The language of the MNDA is sufficiently definite for this Court to enforce, and Joby drafted the MNDA.  Moreover, the specific performance requested by Aerosonic mirrors Joby's existing obligations under the MNDA.

162.    Absent equitable relief and specific performance, Aerosonic will suffer substantial, irreparable, and incalculable injury for which monetary damages will not provide adequate compensation.  Without protection of its Proprietary Information, Aerosonic will be unable to benefit from its Proprietary Information in future dealings with its customers.

163.    The MNDA provides that the prevailing party in a proceeding to enforce the provisions of the MNDA shall be entitled to recover "costs and attorneys' fees."  Aerosonic seeks recovery of its costs and attorneys' fees incurred in connection with this lawsuit as the prevailing party.

## COUNT II

## <u>MISAPPROPRIATION OF TRADE SECRETS</u>

## <u>UNDER THE DEFEND TRADE SECRETS ACT</u>

## <u>(Against Joby Aero, Inc.)</u>

164.    Aerosonic owns and possesses trade secrets, including those detailed in paragraphs 35 through 40, 45, and 46, above.

165.    In connection with the "potential business relationship" under the MNDA between Joby and Aerosonic, Joby acquired Aerosonic's trade secrets.

166.    Aerosonic entrusted Joby and its representatives with access to Aerosonic's trade secrets under a duty to maintain the secrecy of that information and limit its use, including information regarding the designs, dimensions, tolerances, thermal management technology, materials, test procedures and/or reports (for calibration and for acceptance and qualification testing), and related technologies for Aerosonic's air data probes.

167.    Joby acquired at least the following Aerosonic trade secret information:

- (1) engineering drawings, (2) 3D models, (3) loaner units of Aerosonic's air data parts, (4) information derived from units of Aerosonic's air data parts that Joby purchased, (5) calibration, acceptance and qualification test procedures and/or reports, (6) wind tunnel data, (7) other technical documentation and manuals, (8) written communications containing technical information about Aerosonic's air data parts, and (9) verbal communications containing technical information about Aerosonic's air data parts;

- the particular and specific designs, dimensions, tolerances, materials, test procedures and/or reports (for calibration and for acceptance and qualification), and related technologies for Aerosonic's air data probes;

- the engineering drawings provided to Joby on February 11, 2019;

- the engineering drawings provided to Joby on October 29, 2019;

- engineering drawings, 3D models, air data probe test procedure data sheets, and a loaner air data probe for Joby to evaluate for inclusion on Joby's flight-test aircraft and mass-production aircraft that Aerosonic disclosed in 2020;

- Acceptance Test Procedures, Acceptance Test Reports, Qualification Test Procedures, Qualification Test Reports, First Article Inspection Reports, 3D models, 2D drawings, and wind tunnel data Aerosonic disclosed as part of Joby's evaluation of a potential business relationship during the period following execution of the MNDA and the Clearwater meeting;

- confidential trade secret Test Data disclosed by Aerosonic with the ten SLZ8400-2L/SLZ8400-2R air data probes that Joby purchased from Aerosonic, including First Article Inspection Reports and wind tunnel data;

- information obtained or derived from Joby's unauthorized and prohibited reverse engineering, breaking down, analyzing, or copying of any of the ten SLZ8400-2L/SLZ8400-2R air data probes that Joby purchased from Aerosonic, which are subject to Aerosonic's Sales Terms and Conditions and the terms of the MNDA;

- engineering drawings, 3D models, wind tunnel test data, air data probe test procedures and/or reports, and other technical documentation and manuals Aerosonic disclosed to Joby in 2021 and 2022 as part of Joby's evaluation of a potential business relationship.

168.   At the time Joby acquired each Aerosonic trade secret, Joby knew or had reason to know that it acquired the information under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, including because the information was marked with Aerosonic's proprietary notice, subject to

Aerosonic's Sales Terms and Conditions, and/or acquired subject to the terms of the MNDA.

169. At the time Joby acquired each Aerosonic trade secret, Joby knew or had reason to know that the information was a trade secret, including because the information was marked with Aerosonic's proprietary notice, subject to Aerosonic's Sales Terms and Conditions, and/or acquired subject to the terms of the MNDA.

170. Aerosonic takes reasonable measures to protect its trade secrets, including at all times during its course of dealing with Joby.

171. Aerosonic maintains the secrecy of its trade secrets by executing confidentiality agreements with employees, independent contractors, suppliers, current customers, and prospective customers, including the MNDA.

172. Aerosonic allows access to its trade secrets on a need-to-know basis with its employees and certain customers and partners subject to strict confidentiality agreements with an express obligation to protect confidentiality.

173. Aerosonic has minimal mandatory disclosure obligations to shareholders and regulators, which provides Aerosonic greater control over its trade secrets.

174. Aerosonic uses technologically sophisticated firewalls, private networks, and other technical mechanisms to ensure the security of its trade secrets.

175. Aerosonic's trade secrets are password protected on company computers. Further, Aerosonic has access restrictions on computers themselves and on electronic file storage folders and applications.

176. Aerosonic controls its employees' access to its trade secrets and provides various levels of access on a need-to-know basis.

177. Aerosonic regularly instructs and repeatedly reminds its employees of the highly sensitive nature of its trade secrets.

178. Aerosonic requires that employees read employee handbooks governing the treatment of trade secrets.

179. Aerosonic requires that employees attend training on the protection of trade secrets.

180. Aerosonic requires departing employees to return all documents and Aerosonic computers or devices. Aerosonic terminates departing employees' access to all Aerosonic computers and systems.

181. Aerosonic controls access to its headquarters in Clearwater, Florida by requiring its employees, independent contractors, and all other parties to use badges or other security mechanisms for building entry.

182. Aerosonic has controlled access doors limiting access to its headquarters.

183. When Joby's employees visited Aerosonic's headquarters, they were required to sign in to Aerosonic's visitor logbook.

184. The MNDA required Joby to maintain the confidentiality of Aerosonic's trade secrets, to not disclose the information to third parties, and to not use the information for purposes other than to "evaluate internally a potential business relationship" with Aerosonic.

185. Aerosonic's trade secrets provide a competitive advantage to Aerosonic, and Aerosonic derives independent economic value from its trade secrets not being generally known. Aerosonic's trade secrets have value to Aerosonic because they allow Aerosonic to meet stringent aircraft requirements quickly with high reliability and high repeatability in customizable designs supplied in products to the worldwide market, leading to customer satisfaction with Aerosonic's smaller and lighter form factor enabled by use of Aerosonic's trade secrets, as compared to traditional industry air data probes.

186. Aerosonic has developed its trade secrets over decades and at great expense. Aerosonic's trade secrets are the cornerstone of its business. If Aerosonic's trade secrets were not protected, others could manufacture identical air data parts and aircraft manufacturers could

manufacture identical air data parts in-house, which would destroy Aerosonic's competitive advantage.

187.    Joby used and is using each of Aerosonic's trade secrets, including those described in paragraphs 35 through 40, 45, and 46 above, without Aerosonic's consent to design, develop, calibrate, test, qualify, and manufacture air data probes at least for its flight-test aircraft and mass-production aircraft.

188.    By using Aerosonic's trade secrets, Joby avoided the significant time, resources, and expertise required to develop air data probes from scratch.

189.    Joby's use of Aerosonic's trade secrets enabled Joby to make unauthorized and unlicensed replicas of portions or all of Aerosonic's air data probes, including copying aspects of internal and external designs, dimensions, tolerances, testing, procedures, calibrations, performance, and functionality, constituting misappropriation of Aerosonic's trade secrets.

190.    Joby has been using Aerosonic's trade secrets since at least April 2022, when Joby decided to develop air data probes without telling Aerosonic, and while continuing to solicit Aerosonic's trade secrets and Proprietary Information and purchase Aerosonic's air data probes.

191.    By stealing Aerosonic's trade secrets related to the SLZ8400-2, SLZ8420, and BB3 air data probes, Joby avoided years of research and

development time and tens of millions of dollars of investment expenses, causing damages to Aerosonic in amounts that exceed one-hundred million dollars.

192.   Aerosonic has expended hundreds of millions of dollars and a significant amount of time and other resources in developing its trade secrets across Aerosonic's portfolio of products.

193.   Aerosonic's trade secrets derive independent economic value from not being generally known nor being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  Aerosonic's trade secrets are of great value to Aerosonic and would provide others an unfair competitive advantage.

194.   Aerosonic's trade secrets are of great value to Aerosonic and would provide one who improperly acquired them an unfair competitive advantage by allowing it to: (1) not expend time and resources to develop the trade secrets as Aerosonic has done, (2) quickly develop air data parts that unfairly compete with Aerosonic in order to diminish Aerosonic's head start, thereby creating an unfair head start, and (3) gain other improper advantages.

195.   Joby misappropriated Aerosonic's trade secrets by improperly copying, reverse engineering, and using Aerosonic's trade secrets for its

own benefit, including in the development of its flight-test aircraft and mass-production aircraft.

196.   In violation of Aerosonic's rights, Joby willfully and maliciously misappropriated Aerosonic's trade secrets and converted Aerosonic's trade secrets for use in manufacturing air data probes.

197.   Joby further misappropriated Aerosonic's trade secrets by acquiring them through improper means, including (1) deriving them through unauthorized and prohibited reverse engineering, breaking down, analyzing, or copying of any of the ten SLZ8400-2L/SLZ8400-2R air data probes that Joby purchased from Aerosonic, which are subject to Aerosonic's Sales Terms and Conditions and the terms of the MNDA; and (2) soliciting trade secrets from Aerosonic under the guise of a potential business relationship when Joby no longer intended to pursue that relationship.

198.   Aerosonic's trade secrets relate to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign commerce.  Specifically, Aerosonic's trade secrets are used to manufacture air data probes, which have been sold to and flown by customers in the United States (outside of Florida) and outside the United States.  As stated in paragraph 105 above, Aerosonic's sale of SLZ8400-

2L/SLZ8400-2R air data probes to Joby in California constitutes sales of product, made using the trade secrets, in interstate commerce.

199.   Joby engaged in acts in furtherance of its misappropriation in Florida.  Joby's solicitation of Aerosonic in Florida, numerous contacts with Aerosonic in Florida, and communications with Aerosonic representatives in Florida all constitute acts in furtherance of trade secret misappropriation in Florida and in the United States under the DTSA.

200.   Joby knew or should have known that Aerosonic disclosed trade secrets to Joby.

201.   Joby is still in possession of Aerosonic's trade secrets, and Joby is still able to access and use Aerosonic's trade secrets.

202.   Joby's misappropriation of Aerosonic's trade secrets has been intentional, knowing, willful, and malicious.

203.   If Joby's conduct is not remedied, Joby will continue to misappropriate and use Aerosonic's trade secrets for its own benefit and to Aerosonic's detriment.

204.   Because Aerosonic's remedy at law is inadequate, Aerosonic seeks to recover and protect its trade secrets and other legitimate business interests.  Moreover, Joby's intentional, knowing, willful, and malicious misappropriation indicates that injunctive or other equitable relief will be inadequate to prevent Joby's future misconduct.  Therefore, Aerosonic

seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of Aerosonic's trade secrets in Joby's possession, custody, or control as necessary to prevent the propagation or dissemination of Aerosonic's trade secrets, for other legitimate business interests, and to prevent further misappropriation.

205.   As the direct and proximate result of Joby's conduct, Aerosonic has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

206.   Aerosonic has been damaged by all the foregoing and is also entitled to an award of exemplary damages, costs, and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Aerosonic respectfully requests that the Court enter judgment against Joby as follows:

On Aerosonic's claim for breach of contract against Joby Aero, Inc.:

(a)    Awarding damages in an amount to be proven at trial;

(b)    Ordering specific performance that Joby comply with its obligations under the MNDA;

(c)    Ordering preliminary and permanent injunctive relief enjoining Joby from possessing, using, disclosing, or otherwise misappropriating Aerosonic's Proprietary Information;

(d)     Awarding reasonable attorneys' fees to Aerosonic as the prevailing party;

(e)     Awarding expenses, costs, and disbursements in this action;

(f)     Awarding prejudgment interest; and

(g)     Awarding such other and further relief as the Court deems just and proper.

On Aerosonic's claim for trade secret misappropriation against Joby Aero, Inc.:

(a)     Awarding compensatory damages including actual losses, unjust enrichment, and/or royalties in an amount to be proven at trial;

(b)     Awarding exemplary damages in an amount to be proven at trial;

(c)     Ordering preliminary and permanent injunctive relief enjoining Joby from possessing, using, disclosing, or otherwise misappropriating Aerosonic's trade secrets;

(d)     Ordering the seizure of any and all of Aerosonic's trade secrets in Joby's possession, custody, or control as necessary to prevent the propagation or dissemination of Aerosonic's trade secrets, for other legitimate business interests, and to prevent further misappropriation;

(e)     Awarding reasonable attorneys' fees to Aerosonic;

(f)     Awarding expenses, costs, and disbursements in this action;

(g)     Awarding prejudgment interest; and

(h)     Awarding such other and further relief as the Court deems just

and proper.

Dated: June 17, 2025                    Respectfully submitted,

*/s/ Allison M. Stevenson*
Troy A. Fuhrman (Bar No. 985211)
***LEAD COUNSEL FOR PLAINTIFF***
Allison M. Stevenson (Bar No. 126620)
Hill Ward Henderson
101 E. Kennedy Boulevard, Suite 3700
Tampa, Florida 33602
Telephone:   +1.813.221.3900
Email: troy.fuhrman@hwhlaw.com
          allison.stevenson@hwhlaw.com

Randall E. Kay (Admitted *Pro Hac Vice*)
Jones Day
4655 Executive Drive, Suite 1500
San Diego, California 92121.3134
Telephone:   +1.858.314.1200
Facsimile:   +1.844.345.3178
Email:        rekay@jonesday.com

Calvin P. Griffith (Admitted *Pro Hac Vice*)
Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114.1190
Telephone:   +1.216.586.3939
Facsimile:   +1.216.579.0212
Email:        cpgriffith@jonesday.com

Zachary J. Hardy (Admitted *Pro Hac Vice*)
Jones Day
1755 Embarcadero Road
Palo Alto, California 94303.3304
Telephone:   +1.650.739.3939
Facsimile:   +1.650.739.3900
Email:        zhardy@jonesday.com
*Attorneys for Plaintiff Aerosonic LLC*

NAI-5001478094v1

47

## <u>DEMAND FOR JURY TRIAL</u>

Aerosonic respectfully requests a jury trial in this action on all issues so triable.

Dated: June 17, 2025

Respectfully submitted,

*/s/ Allison M. Stevenson*
Troy A. Fuhrman (Bar No. 985211)
Allison M. Stevenson (Bar No. 126620)
Hill Ward Henderson
101 E. Kennedy Boulevard, Suite 3700
Tampa, Florida 33602
Telephone:   +1.813.221.3900
Email: troy.fuhrman@hwhlaw.com
         allison.stevenson@hwhlaw.com

Randall E. Kay (Admitted *Pro Hac Vice*)
Jones Day
4655 Executive Drive, Suite 1500
San Diego, California 92121.3134
Telephone:   +1.858.314.1200
Facsimile:   +1.844.345.3178
Email:       rekay@jonesday.com

Calvin P. Griffith (Admitted *Pro Hac Vice*)
Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114.1190
Telephone:   +1.216.586.3939
Facsimile:   +1.216.579.0212
Email:       cpgriffith@jonesday.com

Zachary J. Hardy (Admitted *Pro Hac Vice*)
Jones Day
1755 Embarcadero Road
Palo Alto, California 94303.3304
Telephone:   +1.650.739.3939
Facsimile:   +1.650.739.3900
Email:       zhardy@jonesday.com
*Attorneys for Plaintiff Aerosonic LLC*

NAI-5001478094v1

48

21070703v1