```
                     UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                           TAMPA DIVISION

AEROSONIC LLC,

          Plaintiff,

v.                                Case No. 8:25-cv-554-VMC-AAS


JOBY AERO, INC.,

          Defendant.
_____/
```

**ORDER**

This matter comes before the Court pursuant to Defendant Joby Aero, Inc.'s Motion to Dismiss First Amended Complaint (Doc. # 53), filed on July 8, 2025. Plaintiff Aerosonic LLC responded on July 29, 2025. (Doc. # 57). For the reasons that follow, the Motion is denied.

## I.    **Background**

Aerosonic develops "aviation and avionics equipment, including air data systems, displays, instruments, sensors, and probes." (Doc. # 45 at 2). Its expertise lies in "'air data,' i.e., the measurement of air pressure to output useful information that enables safe aircraft operation." (Id.). Aerosonic's "air data parts" are the product of "extensive research and development refined by decades of experience." (Id. at 3). Aerosonic "develops and retains its own

1

intellectual property related to the research, development, manufacture, calibration, and acceptance and qualification testing of its air data parts." (Id.).

"Joby is developing electric vertical takeoff and landing ('eVTOL') aircraft." (Id.). Joby has tried "to prototype and manufacture air data parts in house," but it "has also relied on outside suppliers in the past." (Id. at 4). Before 2022, "Joby had not attempted to design, develop, test, calibrate, or manufacture air data probes." (Id.). At various points, "Joby wanted Aerosonic to supply air data probes that were capable of measuring pitot pressure, static pressure, angle of attack, and angle of sideslip for Joby's flight-test aircraft and eventual mass-production aircraft." (Id.).

Joby and Aerosonic signed a Mutual Nondisclosure Agreement ("MNDA") in September 2021. (Id.; Doc. # 45-1). The agreement related to "Proprietary Information," which is "information relating to [either party's] business (including, without limitation, computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics and other technical, business, financial, customer and product development plans, forecasts, strategies and information)."

(Doc. # 45-1 at 1). "[N]othing will be considered 'Proprietary Information' . . . unless either (1) it is or was disclosed in tangible form and is conspicuously marked 'Confidential,' 'Proprietary' or the like, (2) it is or was disclosed in non-tangible form and identified as confidential at the time of disclosure, or (3) the nature of the information and the manner of disclosure are such that a reasonable person would understand it to be confidential." (Id.). The MNDA applies to Proprietary Information "previously, presently, or subsequently disclosed," so long as the disclosure was "made before the second anniversary of this Agreement." (Id. at 2).

Each party agreed, among other things, (1) to hold the other's Proprietary Information "in strict confidence and to take reasonable precautions to protect such Proprietary Information"; (2) "not to divulge any such Proprietary Information or any information derived therefrom to any third person"; (3) "not to make any use whatsoever at any time of such Proprietary Information except to evaluate internally a potential business relationship with the" other party; and (4) "not to copy or reverse engineer any such Proprietary Information." (Id. at 1). The MNDA also imposes a duty on each party to return any Proprietary Information at the request of the other party. See (Id. at 1-2) ("Immediately

3

upon a request by the Disclosing Party at any time, the Receiving Party will turn over to the Disclosing Party all Proprietary Information of the Disclosing Party and all documents or media containing any such Proprietary Information and any and all copies or extracts thereof.").

Before the MNDA was signed, many documents disclosed by Aerosonic to Joby were marked as confidential with a proprietary notice. See (Doc. # 45 at 14–15) (noting that engineering drawings disclosed in 2019 and 2020 contained "Aerosonic's propriety notice, expressly prohibiting their disclosure or use"); (Id. at 10) (alleging "[e]very page of every engineering drawing that Aerosonic disclosed to Joby contained" Aerosonic's proprietary notice).

Additionally, Aerosonic allegedly disclosed many more documents containing trade secrets to Joby after the MNDA was signed, "including in Acceptance Test Procedures, Acceptance Test Reports, Qualification Test Procedures, Qualification Test Reports, First Article Inspection Reports, 3D models, 2D drawings, and wind tunnel data." (Id. at 17–18). After the MNDA, Aerosonic sold some air probes to Joby beginning in April 2022. (Id. at 19). Around this time, Aerosonic "made additional disclosures by attaching supporting Shipping Documents, including trade secret Test Data." (Id.).

Days after Aerosonic delivered the first probe, Joby asked if it could "purchase the intellectual property rights to Aerosonic's air data probes, but Aerosonic refused." (Id. at 20). "Unbeknownst to Aerosonic, in April 2022" — while the MNDA was in effect — "Joby decided to design and develop air data probes in house." (Id.). Joby did not inform Aerosonic that "it had begun designing and developing air data probes in house." (Id.). "Instead, Joby continued to engage with Aerosonic about a potential business relationship and to solicit confidential, proprietary, and trade secret information about air data probes from Aerosonic." (Id.). "Joby continued to solicit Aerosonic's confidential, proprietary, and trade secret information until Joby stopped communicating with Aerosonic in 2023." (Id.).

According to Aerosonic, all Aerosonic's disclosures to Joby "are protected by the MNDA" because the MNDA applied to past disclosures and future disclosures (up to two years after the MNDA's signing). (Id. at 6). But, according to Aerosonic, "Joby has failed to comply with the terms of the MNDA." (Id.). Aerosonic alleges "Joby used Aerosonic's Proprietary Information to prototype and manufacture air data probes, which constitutes use for purposes other than 'to evaluate internally a potential business relationship.'" (Id.).

5

To support this allegation, Aerosonic points to "Joby's remarkably short development time of its similarly designed own air data probes, despite no prior experience, all while having access to Aerosonic's trade secrets and continuing to solicit Aerosonic's trade secrets after deciding to develop probes without telling Aerosonic." (Id. at 28). In addition, "nonexternal design elements of Joby's air data probes match[] Aerosonic's air data probes" — specifically, a YouTube video of Joby's factory "showed one of Joby's integrated air data probes unattached to an aircraft." (Id.). This "air data probe has the same distinctive geometric design as the interface for Aerosonic's integrated air data probe — specifically, Aerosonic's BB3 air data probe." (Id.). That geometric design "is Aerosonic's trade secret, is not readily observable when mounted on an aircraft, and was included in the engineering drawings and other confidential disclosures Aerosonic made to Joby." (Id. at 28-29). After Aerosonic brought the video to Joby's attention in a cease-and-desist letter, "the video was later edited to remove frames showing Joby's integrated air data probe." (Id. at 29).

Notably, Aerosonic has requested multiple times that Joby return its Proprietary Information. (Id. at 29-30). Yet, Joby allegedly has refused to return any Proprietary

Information "because Joby continues to use Aerosonic's 'acceptance, qualification, and testing reports and data.'" (Id. at 30).

According to the amended complaint, Aerosonic "has suffered significant damages" because of Joby's conduct. (Id. at 33). Specifically, "[b]y stealing Aerosonic's trade secrets related to the . . . air data probes, Joby avoided years of research and development time and tens of millions of dollars of investment expenses, causing damages to Aerosonic in amounts that exceed one-hundred million dollars." (Id. at 41-42).

Based on this alleged conduct, Aerosonic brought this action against Joby. (Doc. # 1). In the amended complaint, Aerosonic asserts claims for breach of contract (Count I) and misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") (Count II). Joby moves to dismiss the amended complaint (Doc. # 53), and Aerosonic has responded. (Doc. # 56). The Motion is ripe for review.

## II.  **Legal Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250,

1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004); see also Hi-Tech Pharms., Inc. v. HBS Int'l Corp., 910 F.3d 1186, 1189 (11th Cir. 2018) ("Under the doctrine of incorporation by reference, we may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity.").

8

III. **Analysis**

As an initial matter, the Court will not consider the items discussed in Joby's previous motion for judicial notice. (Doc. # 24). These items are not central to or referenced in the amended complaint.

The Court likewise declines to consider Joby's purchase order and attached terms and conditions, Aerosonic's terms and conditions, and fulfillment papers attached to Joby's Motion. (Doc. # 53 at 5 n.5; Doc. # 53-2; Doc. # 53-3; Doc. # 53-4). Aerosonic does not allege that Joby breached the sales contract formed by these documents. Thus, although these documents were referenced in the amended complaint, they are not central to the amended complaint and the contractual interpretation issues raised by such documents are better addressed at summary judgment. (Doc. # 45 at 19, 22); see Kalpakchian v. Bank of Am. Corp., 832 F. App'x 579, 583 (11th Cir. 2020) ("A document, by definition, is central to a complaint when it is 'a necessary part of [a plaintiff's] effort to make out a claim.'"); Geter v. Galardi S. Enters., Inc., 43 F. Supp. 3d 1322, 1328 (S.D. Fla. 2014) ("[T]he Court may not engage in contract interpretation at the motion to dismiss stage, as these arguments are more appropriate for

summary judgment." (citation and internal quotation marks omitted)).

At this time, the Court will only consider the allegations of the amended complaint and the MNDA that was attached to the amended complaint. The Court addresses each Count in turn.

### A. **Misappropriation Claim**

"To plead a violation of the Defend Trade Secrets Act, a plaintiff must allege that (1) the plaintiff owns a valid trade secret; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; and (3) the defendant misappropriated that trade secret." Direct Components, Inc. v. Microchip USA, LLC, No. 8:23-cv-1617-VMC-SPF, 2024 WL 1929522, at *5 (M.D. Fla. May 2, 2024) (citation and internal quotation marks omitted).

Aerosonic has plausibly pled all elements of its DTSA claim. As to the first element, "the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information" (1) that "the owner thereof has taken reasonable measures to keep [] secret" and (2) that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by,

another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). "[I]nformation alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it." Oakwood Lab'ys LLC v. Thanoo, 999 F.3d 892, 906 (3d Cir. 2021).

The amended complaint alleges that Aerosonic possesses numerous trade secrets, especially in relation to the design and performance of its air probes. (Doc. # 45 at 7-9). Among many other things, Aerosonic's trade secrets include "the specific, distinct geometric design of the interface side of Aerosonic's integrated air data probes, which is not observable while the probe is in service on an aircraft." (Id. at 9). Thus, Aerosonic has sufficiently identified its trade secrets.

The Court rejects Joby's argument that Aerosonic did not take reasonable steps to protect its trade secrets such that they are not protectable. (Doc. # 53 at 20-24). As a general matter, this fact-intensive determination is better left to summary judgment or trial. See Godwin Pumps of Am., Inc. v. Ramer, No. 8:11-cv-580-SCB-AEP, 2012 WL 1110068, at *7 (M.D. Fla. Apr. 3, 2012) ("Courts hesitate to grant summary judgment

when faced with the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable protective steps. Generally, such determinations should be resolved by a fact finder after both sides have fully presented their evidence." (citation omitted)); La Potencia, LLC v. Chandler, 733 F. Supp. 3d 1238, 1270 (S.D. Fla. 2024) ("Assessing the reasonableness of measures taken to ensure secrecy is a factually intensive endeavor.").

Regardless, Aerosonic sufficiently alleges that it took reasonable measures to protect its trade secrets. Many of the documents disclosed to Joby before the MNDA was signed were marked confidential, and the MNDA clarified that previously disclosed Proprietary Information was still subject to the MNDA. (Doc. # 45 at 6, 10, 14-15). Aerosonic's pursuing the signing of the MNDA before disclosing further trade secrets and selling air probes to Joby was a reasonable measure to protect those trade secrets. The alleged presence of one of Joby's third-party contractors, Eric Ohmit, during a technical discussion via Zoom (Doc. # 45 at 16-17) does not suggest that Aerosonic failed to take reasonable measures to protect its Proprietary Information. At least at this stage, it was reasonable for Aerosonic to share trade secrets with Joby that Ohmit might see because Ohmit was working for Joby

12

as a contractor. The Court is mindful that "[m]easures can qualify as 'reasonable' even if they are imperfect or they ultimately fail to thwart misappropriation." La Potencia, LLC, 733 F. Supp. 3d at 1270.

Next, Joby does not dispute the interstate commerce element. Aerosonic is in the business of selling its air probes and other avionics equipment to customers in interstate commerce. This includes Aerosonic's sales of air probes to Joby in California. (Doc. # 45 at 22). The second element of the DTSA claim is satisfied.

The amended complaint also sufficiently alleges misappropriation. "There are three ways to establish misappropriation under the DTSA: improper acquisition, disclosure, or use of a trade secret without consent." Oakwood Lab'ys LLC, 999 F.3d at 907-08 (citing 18 U.S.C. § 1839(5)). "When interpreted specifically in the context of trade secret misappropriation, the term 'use' has been broadly defined as any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant[.] . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers

through the use of information that is a trade secret . . . all constitute 'use.'" Id. at 909 (citation omitted).

This is not a case in which all allegations of misappropriation were pled "upon information and belief." See Direct Components, Inc., 2024 WL 1929522, at *5 (dismissing misappropriation claim where "all allegations that Defendants misappropriated or disclosed Plaintiff's trade secrets are made upon information and belief"). Rather, Aerosonic provides concrete facts to support its claim that Joby has used its trade secrets to develop its own air probe. Joby attempted to purchase Aerosonic's intellectual property, which suggests Joby's desire to use Aerosonic's trade secrets, but Aerosonic refused. (Doc. # 45 at 20). Around that same time and after having purchased some air probes from Aerosonic, Joby began developing an air probe of its own. (Id.). Even after deciding to build its own air probe, Joby continued soliciting further trade secrets from Aerosonic under the guise of evaluating a potential business relationship. (Id.).

With Aerosonic's trade secrets in its possession, Joby allegedly built its own air probe in a much shorter time frame than usual. (Id. at 23, 28). While Joby developed its air probe in about two years, Aerosonic, based on its "decades of

14

experience with air data probes," estimates that it "would likely have taken a decade or more and millions of dollars of investment" for Joby to develop an air probe without the use of Aerosonic's trade secrets. (Id. at 23). Furthermore, the "interface" of Joby's probe, which is "not normally visible when the probe is mounted to the aircraft," possesses the "same distinctive design as the interface for Aerosonic's integrated air data probe." (Id. at 28). This "geometric design of the interface of Aerosonic's integrated air data probe is Aerosonic's trade secret, is not readily observable when mounted on an aircraft, and was included in the engineering drawings and other confidential disclosures Aerosonic made to Joby." (Id. at 28-29). These allegations are more than enough to establish an inference that Joby used Aerosonic's trade secrets without consent, whether through utilization of the engineering drawings and test data or reverse-engineering the probes Joby purchased. See Pegasus Imaging Corp. v. Northrop Grumman Corp., No. 8:07-cv-1937-JDW-EAJ, 2010 WL 4627721, at *5 (M.D. Fla. Nov. 5, 2010) (denying summary judgment on Florida Uniform Trades Secret Act misappropriation claim where defendant "reverse-engineer[ed] [plaintiff's] source code" despite a prohibition on reverse-engineering in the license agreement).

Finally, because the Court declines to consider the
various documents comprising the sales contracts at this
stage, the Court rejects Joby's arguments concerning the
sales contracts and the battle of the forms. (Doc. # 53 at
18-20).

The Motion is denied as to the DTSA claim.

B. **Breach of Contract Claim**

Joby also moves to dismiss the breach of contract claim.
Joby's primary argument — that the MNDA "does not govern
anything Joby did with items it purchased from Aerosonic" —
focuses on the sales contracts Joby attaches to its Motion.
(Doc. # 53 at 8-11). Joby also argues that, if the MNDA
applies as Aerosonic alleges, "Aerosonic has failed to prove
breach because it has not plausibly alleged that Joby used
any Aerosonic information to develop its air probe" and
"Aerosonic has not alleged any damages arising out of the
alleged breach." (Id. at 9).

The Court denies the Motion. Joby's arguments regarding
the sales contracts fail because the Court will not consider
those documents or engage in contractual interpretation at
the pleading stage. Furthermore, the amended complaint states
a claim for breach of contract. Under California law, which
governs the MNDA, the elements of a breach of contract claim

16

are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." Mandel v. Hafermann, 503 F. Supp. 3d 946, 973-74 (N.D. Cal. 2020) (quoting Coles v. Glaser, 2 Cal. App. 5th 384, 391 (2016)).

Joby does not challenge the existence of the MNDA or Aerosonic's performance, which are sufficiently alleged in the amended complaint. (Doc. # 45 at 4-7). The amended complaint also includes plausible allegations that Joby breached the MNDA. For the same reasons the DTSA claim is sufficiently pled, Aerosonic's allegations of breach based on Joby's reverse engineering its air probe and other improper uses of Aerosonic's Proprietary Information are sufficient. See Hurry Fam. Revocable Tr. v. Frankel, No. 8:18-cv-2869-VMC-CPT, 2019 WL 2868945, at *2 (M.D. Fla. July 3, 2019) ("The same analysis is used when considering both statutory and contractual claims for misappropriation of trade secrets."). Aerosonic alleges in detail that the MNDA applied to disclosures of Proprietary Information made before the MNDA was signed, such that Joby's alleged use of that information would violate the MNDA. (Doc. # 45 at 6; Doc. # 45-1 at 1). Aerosonic also clearly alleges that Joby purchased air probes from Aerosonic after the MNDA was signed, such that the MNDA

17

was in force when Joby allegedly reverse engineered the air
probes. (Doc. # 45 at 16-19).

Likewise, Aerosonic has plausibly pled that Joby
breached the MNDA by failing to return Aerosonic's
Proprietary Information when requested, as required by the
MNDA. (Id. at 29-30). The failure to return allegation by
itself plausibly states a breach of the MNDA, apart from
Aerosonic's other plausible allegations that Joby used its
trade secret information.[1]

Finally, Aerosonic has plausibly pled damages for the
breach claim. Aerosonic alleges, albeit within the DTSA
count, that "[b]y stealing Aerosonic's trade secrets related
to the . . . air data probes, Joby avoided years of research
and development time and tens of millions of dollars of
investment expenses, causing damages to Aerosonic in amounts
that exceed one-hundred million dollars." (Id. at 41-42). It
is a reasonable inference that Aerosonic would have made
significant profits continuing to sell air probes to Joby if

---

[1] For the sake of efficiency, the Court has focused its
analysis of both claims on some of the amended complaint's
allegations that are sufficient to support Aerosonic's
claims. The parties should not interpret the Court's focus on
certain allegations or theories as a determination that the
other allegations or theories included within the amended
complaint are implausible or insufficient.

Joby had not allegedly violated the MNDA and used Aerosonic's trade secrets to build its own air probe. Likewise, Joby's failure to return Aerosonic's trade secrets suggests that Joby is continuing to utilize Aerosonic's trade secrets to Aerosonic's detriment.

In short, the Motion is denied. Joby may raise its various arguments again at the summary judgment stage.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Joby Aero, Inc.'s Motion to Dismiss First Amended Complaint (Doc. # 53) is **DENIED.** Joby's answer is due within 14 days of this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 29th day of August, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE