**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| AEROSONIC LLC,<br><br>Plaintiff,<br><br>v.<br><br>JOBY AERO, INC.,<br><br>Defendant.<br><br>--------------------------------------------------------<br><br>JOBY AERO, INC.,<br><br>Counterclaims Plaintiff<br><br>v.<br><br>AEROSONIC LLC and TRANSDIGM GROUP INC.,<br><br>Counterclaims Defendants. | Case No. 8:25-cv-554-VMC-AAS<br><br>**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, INJUNCTIVE RELIEF SOUGHT, AND DEMAND FOR JURY TRIAL AND AFFIRMATIVE DEFENSES**

Defendant Joby Aero, Inc. ("Joby") hereby submits its Answer in response to the First Amended Complaint ("FAC") filed by Plaintiff Aerosonic LLC ("Aerosonic") as set forth below.

Each paragraph of the Answer below corresponds to the corresponding numbered or lettered paragraph of the FAC. All allegations not expressly admitted herein are denied by Defendant.

## NATURE OF THE ACTION[1]

1. Deny, including because this paragraph contains legal conclusions to which no response is required.

2. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

## PARTIES

3. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

4. Deny.

5. Deny.

6. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

7. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

8. Admit only that Aerosonic's products include at least some air data probes. For the remainder: Deny.

9. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

10. Joby lacks knowledge or information sufficient to form a belief about the

[1] Joby does not respond to headings or sub-headings in the FAC because they are not allegations in numbered paragraphs. *See* Fed. R. Civ. P. 10(b) ("A party must state its claims or defenses in numbered paragraphs . . . .").

truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

11. Admit.

12. Admit.

13. Admit only that Joby intends to operate its eVTOL aircraft as an air taxi service in cities around the world and sell its aircraft to other operators and partners. For the remainder: Deny.

14. Admit only that, to date, Joby has raised over two billion dollars through investments from Toyota, Delta Air Lines, Uber, and others. For the remainder: Deny.

15. Admit only that Joby has prototyped and manufactured air data parts in-house and has also relied on outside suppliers for air data parts. For the remainder: Deny.

16. Admit only that, to the best of Joby's knowledge, Joby had not manufactured air data probes before 2022. For the remainder: Deny.

17. Admit only that Joby was exploring having Aerosonic supply air data probes that were capable of measuring pitot pressure, static pressure, angle of attack, and angle of sideslip for Joby's aircraft. For the remainder: Deny.

## FACTUAL ALLEGATIONS

18. Admit only that the MNDA includes the text: "The Receiving Party agrees . . . not to make any use whatsoever at any time of such Proprietary Information

except to evaluate internally a potential business relationship with the Disclosing Party." For the remainder: Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

19. Admit.

20. Admit only that the MNDA contains the quoted text. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

21. Admit only that the MNDA contains the quoted text. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

22. Admit only that the MNDA contains the quoted text. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

23. Admit only that the MNDA contains the quoted text. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

24. Admit only that the MNDA contains the text "Each undersigned party (the 'Receiving Party') understands that the other party (the 'Disclosing Party') has disclosed or may disclose information relating to the Disclosing Party's business (including, without limitation, computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not),

schematics and other technical, business, financial, customer and product development plans, forecasts, strategies and information), which to the extent previously, presently or subsequently disclosed to the Receiving Party is hereinafter referred to as 'Proprietary Information' of the Disclosing Party." For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

25. Deny, including because this paragraph contains legal conclusions to which no response is required.

26. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

27. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

28. Admit only that the MNDA is based on a standard Joby NDA. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

29. Deny, including because this paragraph contains legal conclusions to which no response is required.

30. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

31. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal

conclusions to which no response is required.

32. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

33. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

34. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

35. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

36. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

37. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

38. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

39. Joby lacks knowledge or information sufficient to form a belief about the

truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

40. Admit only that the MNDA contains the quoted text. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

41. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

42. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

43. Admit only that at least one or more drawings provided by Aerosonic contained the quoted text. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

44. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

45. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

46. Joby lacks knowledge or information sufficient to form a belief about the

truth of the allegations.

47. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

48. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

49. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

50. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

51. Admit only that the MNDA contains the text: "not to copy or reverse engineer any such Proprietary Information." For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

52. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

53. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

54. Joby lacks knowledge or information sufficient to form a belief about the

truth of the allegations.

55. Admit only that Joby plans to use air data probes for its production aircraft. For the remainder: Deny.

56. Admit only that Joby explored options for both sourcing air data parts and developing them itself. For the remainder: Deny.

57. Deny.

58. Admit only that Joby explored the option of sourcing an air data probe from Aerosonic. For the remainder: Deny.

59. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

60. Deny.

61. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

62. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

63. Deny.

64. Admit only that Mr. Saunders and Mr. O'Connor spoke at least once in 2020. For the remainder, Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

65. Admit only that Joby was interested in a 5-hole air data probe from Aerosonic. For the remainder: Deny.

66. Admit only that, in 2020, Aerosonic provided documents and an air data

probe to Joby for evaluation. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

67. Admit only that certain Joby employees traveled to Clearwater, Florida, in September 2021. For the remainder: Deny.

68. Admit only that, on September 22, 2021, Joby personnel met with Aerosonic personnel at the Island Way Grill at 20 Island Way, Clearwater, Florida 33767. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

69. Admit only that, on September 23, 2021, Joby personnel visited Aerosonic's headquarters in Clearwater, Florida, to meet with Aerosonic. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

70. Admit.

71. Admit.

72. Admit only that Didier Papadopoulos, Edward Kikta, Matt Stich, and Eric Ohmit participated in the technical discussions. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

73. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

74. Admit.

75. Deny, including because this paragraph contains legal conclusions to which no response is required.

76. Deny.

77. Admit only that, after Joby visited Clearwater, Florida, and Aerosonic's headquarters in Clearwater, Joby purchased items from Aerosonic to test its aircraft. For the remainder: Deny.

78. Admit only that Joby was interested in a 5-hole air data probe from Aerosonic. For the remainder: Deny.

79. Admit only that, on September 24, 2021, Aerosonic responded to Joby's request for a response to its RFP. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

80. Admit only that, on September 25, 2021, Mr. O'Connor sent an email to Aerosonic addressing Aerosonic's response and "request[ing] a formal quote for the short-term units." For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

81. Admit.

82. Deny.

83. Admit only that Aerosonic delivered to Joby two left probes and two right probes in early April 2022. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

84. Admit only that Joby purchased items to test its aircraft, including items

provided along with air data probes. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

85. Deny.

86. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

87. Deny, including because this paragraph contains legal conclusions to which no response is required.

88. Admit only that Joby investigated the feasibility of developing an in-house air data probe in April 2022. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

89. Admit only that, to the best of its current knowledge, Joby did not tell Aerosonic in April 2022 that Joby had started to investigate the feasibility of developing an in-house air data probe. For the remainder: Deny.

90. Admit only that Joby continued to evaluate Aerosonic as an air data probe vendor. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations and this paragraph contains legal conclusions to which no response is required.

91. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

92. Admit only that the MNDA includes the text: "This Agreement applies only to disclosures made before the second anniversary of this Agreement." For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

93. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

94. Admit only that Joby purchased air data probes from Aerosonic to test its aircraft. For the remainder: Deny.

95. Admit only that, on April 25, 2022, Mr. Young sent an email with the subject line "Additional Probes?" to Aerosonic that asked for a formal quote from Aerosonic for additional air data probes and asked, "is there a potential to purchase a quantity to support our prototype build later this year?" For the remainder: Deny.

96. Admit.

97. Deny.

98. Admit only that Joby purchased air data probes from Aerosonic to test its aircraft. For the remainder: Deny.

99. Admit only that Joby purchased air data probes and other items from Aerosonic to test its aircraft. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

100. Deny.

101. Joby lacks knowledge or information sufficient to form a belief about the

truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

102. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

103. Admit only that Aerosonic delivered at least ten SLZ8400-2L/SLZ8400-2R air data probes to Joby in 2022 and 2023. For the remainder: Deny.

104. Admit only that Aerosonic sold SLZ8400-2L/SLZ8400-2R air data probes to Joby in California. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

105. Deny.

106. Deny.

107. Admit only that Joby did not purchase any air data probes from Aerosonic other than the ten described herein. For the remainder: Deny.

108. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

109. Admit only that Joby investigated the feasibility of developing an in-house air data probe in April 2022. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

110. Admit only that Joby investigated the feasibility of developing an in-house air data probe in April 2022. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

111. Admit only that Joby purchased air data probes and other items from Aerosonic to test its aircraft. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

112. Deny.

113. Deny.

114. Deny.

115. Admit only that Joby developed an air data probe that was sufficient for testing purposes by March 2024, and that Aerosonic and Joby stopped communicating regarding the potential purchase of air data probes in 2023. For the remainder: Deny.

116. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

117. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

118. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal

conclusions to which no response is required.

119. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

120. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

121. Admit only that, to the best of its current knowledge, Joby did not tell Aerosonic in April 2022 that Joby had started to investigate the feasibility of developing an in-house air data probe. For the remainder: Deny, including because this paragraph contains legal conclusions to which no response is required.

122. Admit.

123. Admit only that some Joby aircraft have three air data probes. For the remainder: Deny.

124. Admit only that the listed N-Numbers correspond to Joby aircraft. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

125. Admit.

126. Admit only that, according to Joby's public press releases, two of Joby's aircraft are eVTOLs that Joby delivered to Edwards Air Force Base as part of a Department of Defense contract valued up to $131 million. For the remainder: Deny.

127. Admit.

128. Admit only that Aerosonic sold ten air data probes to Joby. For the remainder: Deny.

129. Admit only that Aerosonic sold ten air data probes to Joby. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

130. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

131. Admit.

132. Admit only that Joby announced it will deliver two aircraft to MacDill Air Force Base in 2025 as part of the Company's AFWERX Agility Prime contract with the U.S. Air Force. For the remainder: Deny.

133. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

134. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

135. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

136. Admit only that a posted video showed Joby's air data probe. For the remainder: Joby lacks knowledge or information sufficient to form a belief about the

truth of the allegations.

137. Admit only that the Joby air data probe was unattached from the aircraft in the video. For the remainder: Deny.

138. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

139. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

140. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

141. Admit.

142. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

143. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

144. Admit only that Aerosonic sent a letter on July 31, 2024, which stated, in part, "return all Aerosonic confidential and/or proprietary information in Joby's possession (or provided to third parties) as required by Section 3 of the MNDA." For the remainder: Joby lacks knowledge or information sufficient to form a belief about

the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

145. Admit only that the December 5, 2024 letter from Josh Ryland included the text: "Thus, as expressly requested in Aerosonic's July 31, 2024 letter and required by the parties' agreement, Joby must return all Aerosonic confidential and proprietary material in possession immediately." For the remainder: Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

146. Admit only that Joby has not "turned over" Aerosonic information, but the parties have been discussing his and Joby has agreed to "identify information received from Aerosonic to be (1) quarantined with outside counsel and (2) retained by Joby for ongoing operations." For the remainder: Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

147. Admit only that Joby has not "turned over" Aerosonic information, but the parties have been discussing this, and Joby has agreed to "identify information received from Aerosonic to be (1) quarantined with outside counsel and (2) retained by Joby for ongoing operations." For the remainder: Deny.

## JURISDICTION AND VENUE

148. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

149. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

150. Admit only that Joby is not contesting personal jurisdiction. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

151. Admit only that Joby is not contesting that venue is proper, although Joby maintains that venue is inconvenient under 28 U.S.C. section 1404. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

## COUNT I
## BREACH OF CONTRACT
## (Against Joby Aero, Inc.)

152. Admit only that the MNDA is a written agreement between Aerosonic and Joby. For the remainder: This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

153. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

154. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

155. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

156. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

157. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

158. Admit only that the MNDA contains the quoted text. For the remainder: This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

159. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

160. Admit only that the MNDA is based on a standard Joby NDA. For the remainder: Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

161. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations and this paragraph contains legal

conclusions to which no response is required.

162. Admit only that the MNDA contains the quoted text. For the remainder: This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**
**(Against Joby Aero, Inc.)**

163. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

164. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

165. This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

166. Admit only that Aerosonic provided certain types of documents and air data probes to Joby, many of which Joby purchased. For the remainder: This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

167. Deny, including because this paragraph contains legal conclusions to which no response is required.

168. Deny, including because this paragraph contains legal conclusions to which no response is required.

169. Deny, including because Joby lacks knowledge or information sufficient

to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

170. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

171. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

172. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

173. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

174. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

175. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

176. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

177. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

178. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

179. Joby lacks knowledge or information sufficient to form a belief about the

truth of the allegations.

180. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

181. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

182. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

183. Admit only that the MNDA contains the quoted text. For the remainder: This paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

184. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

185. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations.

186. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

187. Deny, including because this paragraph contains legal conclusions to which no response is required.

188. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal

conclusions to which no response is required.

189. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

190. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

191. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

192. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

193. Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required. To the extent a response is required: Deny.

194. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

195. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

196. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

197. Admit only that Aerosonic sold SLZ8400-2L/SLZ8400-2R air data probes to Joby in California. For the remainder: Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

198. Deny, including because this paragraph contains legal conclusions to which no response is required.

199. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

200. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

201. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

202. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

203. Deny, including because Joby lacks knowledge or information sufficient

to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

204. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

205. Deny, including because Joby lacks knowledge or information sufficient to form a belief about the truth of the allegations, and this paragraph contains legal conclusions to which no response is required.

## PRAYER FOR RELIEF

To the extent that the Prayer for Relief requires a response despite not being a numbered paragraph: Deny, including because this paragraph contains legal conclusions to which no response is required.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Subject to the responses above, Defendant alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. In addition to the affirmative defenses described below, and subject to its responses above, Defendant specifically reserves all rights to allege additional affirmative defenses that become known through the course of discovery.

**FIRST DEFENSE**
**(FAILURE TO STATE A CLAIM)**

206. Aerosonic fails to state a claim upon which relief may be granted against Defendant.

**SECOND DEFENSE**
**(FAILURE TO IDENTIFY TRADE SECRETS)**

207. Aerosonic's claims for trade secret misappropriation are barred in whole or in part because Aerosonic has failed to identify its alleged trade secrets with sufficient particularity.

**THIRD DEFENSE**
**(NO TRADE SECRETS)**

208. Joby denies Aerosonic's claims for trade secret misappropriation, including because no trade secrets exist due to lack of ownership, reasonable secrecy measures, and value from being generally known and readily ascertainable. *See* 18 U.S.C. § 1839.

**FOURTH DEFENSE**
**(NO MISAPPROPRIATION)**

209. Joby denies Aerosonic's claims for trade secret misappropriation, including because Joby did not misappropriate by acquisition, disclosure, or use. *See* 18 U.S.C. § 1839.

**FIFTH DEFENSE**
**(EQUITABLE DOCTRINES)**

210. Aerosonic claims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches, and/or other equitable doctrines.

211. For example, Aerosonic understands that the air data probes it sold to Joby would be used on aircraft visible to the public.

212. For example, Joby and Aerosonic understood that Aerosonic's off-the-shelf air data probes were useful in helping Joby test its eVTOL aircraft and that Joby purchased those air data probes so that Joby could then install them on its aircraft to assist in the aircraft's testing, as well as information related to those probes.

**SIXTH DEFENSE**
**(UNCLEAN HANDS)**

213. Aerosonic's equitable claims are barred by the doctrine of unclean hands and/or in part delicto because the claims were brought and maintained in bad faith to chill competition, as explained in, for example, Joby's Counterclaims.

**SEVENTH DEFENSE**
**(COMPETITION PRIVILEGE)**

214. Aerosonic's claims are barred, in whole or in part, by the competition privilege because Joby's conduct was, at all relevant times, done in the context of fair competition and in good faith.

**EIGHTH DEFENSE**
**(NO CONTRACT FORMATION)**

215. Aerosonic's breach of contract claims are barred in whole or in part due to failure to form a contract due to ambiguity.

216. For example, the NDA does not prohibit Joby from using the purchased probes to test its eVTOL aircraft, but Aerosonic claims it does.

**NINTH DEFENSE**
**(TERMS OF CONTRACT)**

217. Aerosonic's claims are barred, in whole or in part, by the terms of the sales contracts resulting from the exchanged terms and conditions.

**TENTH DEFENSE**
**(WAIVER OF CONTRACTUAL RIGHTS)**

218. Aerosonic's breach of contract claims are barred, in whole or in part, by waiver of contract terms because Aerosonic's course of performance is inconsistent with the terms of the NDA.

**ELEVENTH DEFENSE**
**(NO BREACH)**

219. Joby denies that it breached any duty or obligations allegedly owed to Aerosonic. Joby did not misuse any Proprietary Information.

220. Joby fully performed any and all contractual duties owed to Aerosonic.

221. Aerosonic's claims for breach are also barred in whole or in part because Aerosonic has failed to identify its alleged Proprietary Information with sufficient particularity.

**TWELFTH DEFENSE**
**(FAILURE TO MITIGATE)**

222. Aerosonic's claims are barred to the extent that Aerosonic failed to mitigate, minimize, or avoid any damages allegedly sustained.

**THIRTEENTH DEFENSE**
**(SPECULATIVE DAMAGES)**

223. Aerosonic's damages claims are barred, in whole or in part, because the damages are speculative and cannot be established with reasonable certainty.

## DEFENDANT'S COUNTERCLAIMS

## INTRODUCTION

1. The dispute between Aerosonic and Joby arises out of Aerosonic's and its parent company, TransDigm's, desire to maintain their customer base and profitability in the design and manufacture of air data probes.

2. Air data probes are instruments that are installed on the exterior of an aircraft that measure and collect critical air data information like airspeed and altitude that, when returned back to and processed by the aircraft, help the aircraft fly safely.

3. Joby is developing an all-electric, vertical takeoff and landing ("eVTOL") aircraft that it intends to operate in cities around the world. These eVTOL aircraft will

use air data probes to fly safely. But because the Joby eVTOL aircraft is so unique, air data probes that are commonly used by traditional airplanes cannot immediately be retrofitted to suit Joby's long-term commercial needs.

4. Among its other products, Aerosonic sells air data probes. Its parent company, TransDigm, wholly owns several dozen engineering and manufacturing companies that specialize in a particular product for which they are the majority manufacturer. TransDigm's reported business model is to purchase companies that are one of the only players in the market, maximize prices of their products upon acquisition, and force customers who have little other choice to continue to purchase necessary components from those TransDigm's subsidiaries.[2] And long after TransDigm acquires its subsidiaries, as Aerosonic's former CEO himself reported, TransDigm continues to exert control over those subsidiaries' pricing and business operations.[3]

5. Aerosonic and TransDigm tried to draw from the same playbook here.

6. It was clear to Joby that Aerosonic's air data probes would not be a viable option for Joby's long-term commercial needs. As a result, if Joby were to use air data probes manufactured by Aerosonic, Aerosonic would have to make modifications to their off-the-shelf air data probes. Joby and Aerosonic entered into an NDA, in part so

---

[2] Supplemental Memorandum on Actions by TransDigm, United States House of Representatives Committee on Oversight and Reform (May 15, 2019), *available at* 2019-05-15.COR Supplemental Memo-5-15-19 Hearing DOD IG Rept. on Excess Profits by TransDigm Group Inc_.pdf. at 4-5.

[3] *Id.* at 4.

that Joby could protect its valuable proprietary information related to new air data probe requirements in the emerging eVTOL industry, while they evaluated whether to enter into a business relationship.

7. At the same time, Joby and Aerosonic understood that Aerosonic's off-the-shelf probes were useful in helping Joby test its eVTOL aircraft. So Joby arranged to purchase ten Aerosonic off-the-shelf probes that Joby would then install on its aircraft to assist in the aircraft's testing, as well as information related to those probes. Those purchases were governed by the sales contracts between Joby and Aerosonic. However, several of those probes proved to be defective and needed to be replaced.

8. Joby also asked Aerosonic to submit bids for the development and delivery of bespoke air data probes specifically designed for Joby's eVTOL aircraft. In line with TransDigm's playbook of raising prices as soon as it became clear that the customer had nowhere else to turn, Aerosonic returned a quote that was so high as to render it a non-starter.

9. Joby then began to explore other options. One was creating its own bespoke air probe in-house. Measuring air data through an air probe is a decades-old art. Scientists with the National Advisory Committee for Aeronautics, NASA, and others have published extensively on the subject, including on how to measure angle of attack, sideslip, and air speed, as well as how to calibrate and configure air probes. Joby could use public information to design an air probe to meet its particular needs and did so with consultants and other specialists who helped supercharge Joby's own innovative and unique processes. By using 3D printing technology and cutting-edge

iterative engineering techniques, Joby was able to design and test nine different prototypes of an air data probe before creating one suitable for testing within two years.

10. Both Aerosonic and TransDigm did not anticipate Joby's ability to properly test and refine its air data probe design.

11. It was only when Joby proved that it—and indeed any startup ready and willing to engage in these engineering solutions—could develop bespoke air probes without relying on Aerosonic that Aerosonic and TransDigm panicked. They were no longer the only games in town. They could no longer jack up prices for critical components of aircraft and force their customers to buy them. Now, their customers—including Joby—had choices. They could, as Joby did, decide to develop their own bespoke products.

12. And so, belatedly, after having exchanged information for years without an NDA, and demonstrating no real interest in protecting its alleged secrets, and more than two years after all negotiations between Joby and Aerosonic fell apart, and after Joby had proven that it could go it alone—Aerosonic and TransDigm separately and repeatedly claimed that Joby violated the NDA. In addition, Aerosonic and TransDigm separately and repeatedly accused Joby of misappropriating Aerosonic's purported trade secrets by copying Aerosonic's air data probe in the design and creation of Joby's own.

13. But Aerosonic continues to do that which it complains Joby is doing. Aerosonic complains that Joby has not returned proprietary information exchanged under the NDA. But it is Aerosonic that has failed to do so.

14. Aerosonic also breached the sales contracts by selling Joby defective air probes. Aerosonic has still not made Joby whole.

15. And, finally, both Aerosonic and TransDigm have attempted to stifle Joby's lawful business through a series of illegal, unfair, and deceptive acts. For example, if the NDA covered and significantly restricted Joby's ability to use lawfully purchased air probes and related documents it rightfully purchased, the NDA is an unlawful restraint on trade and an unfair and deceptive trade practice, thereby harming competition and violating the strong public policy favoring open markets and the freedom to engage in a lawful business.

16. In addition, Aerosonic and TransDigm sold products to Joby while deceptively concealing their intent to prohibit Joby from using those products for their intended purpose. Had Joby known at the time they were negotiating the terms of the NDA of Aerosonic and TransDigm's unreasonable and commercially prohibitive interpretation, Joby may not have purchased the probes and other information. By intentionally omitting this critical fact, Aerosonic's and TransDigm's conduct was designed to mislead Joby into a transaction that was founded on a deceptive premise. Joby deserves to be made whole and left to pursue its legitimate business unencumbered by this manufactured cloud hanging over its head.

## PARTIES

17. Counterclaims Plaintiff Joby Aero, Inc. ("Joby") is incorporated in Delaware. Joby's principal place of business and headquarters is in Santa Cruz,

California. Joby operates a powertrain and electronics engineering and manufacturing facility in San Carlos, California, as well as 130,000 square feet of additive and subtractive manufacturing, machining, aircraft assembly and flight test facilities in Marina, California. With local support from California state incentives and grants, Joby has begun construction of a new building at its Marina site to support manufacturing and training that will double the footprint of that location.

18. Counterclaim Defendant Aerosonic LLC ("Aerosonic") is a Delaware limited liability company with its principal place of business at 1212 North Hercules Avenue, Clearwater, Florida. Aerosonic is a vendor that sells air data probes and other aviation equipment.

19. Counterclaim Defendant TransDigm Group Inc. ("TransDigm") is a Delaware corporation headquartered in Cleveland, Ohio. On information and belief, TransDigm acquired Aerosonic in 2013, and Aerosonic is now a wholly owned subsidiary of TransDigm.

## JURISDICTION AND VENUE

20. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Joby's claim for breach of contract, unlawful restraint on trade, and violations of California's Unfair or Deceptive Trade Practices Act form part of the same case or controversy as Aerosonic's claims for breach of contract and misappropriation of trade secrets. *See* Fed. R. Civ. P. 13.

21. This Court has personal jurisdiction over Aerosonic because Aerosonic

first filed its complaint here as a resident of Florida and subjected itself to this Court's jurisdiction.

22. This Court has personal jurisdiction over TransDigm because TransDigm, the parent company of Aerosonic, acted on Aerosonic's behalf to prohibit Joby from engaging in the same conduct that Aerosonic alleges in its complaint. TransDigm also appears to be directing this litigation on behalf of Aerosonic.

23. Both Aerosonic and TransDigm have consented to personal jurisdiction in this Court for claims arising out of the facts and circumstances alleged in Aerosonic's complaint. In their joint motion to dismiss Joby's complaint filed in the Northern District of California (a complaint that Joby voluntarily dismissed yesterday), both Aerosonic and TransDigm asked the court to stay or transfer the case to this Court. *Joby v. Aerosonic*, No. 25-cv-04912, Dkt. 23 at 1 (N.D. Cal.). As a result, both Aerosonic and TransDigm have consented to this Court's jurisdiction.

24. Venue is proper pursuant to 28 U.S.C. § 1391, as this is the District in which Aerosonic filed its complaint and is the place where a "substantial part of the events or omissions giving rise to the claim occurred." 29 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. Joby develops an eVTOL aircraft.

25. Joby is developing an all-electric, vertical takeoff and landing ("eVTOL") aircraft that it intends to operate in cities around the world. Joby's team of more than 1,500 engineers, experts, and leaders are focused on bringing this pioneering vision to

life. Joby has a unique design for its eVTOL aircraft, with six propellors that can tilt or rotate vertically to take off and land like a helicopter and that can rotate or tilt horizontally to cruise like an airplane.



26. The Joby eVTOL aircraft is intended to transport a pilot and up to four passengers. Joby intends to operate its eVTOL aircraft as part of a fast, quiet, and convenient service in cities around the world.

27. Joby has built a team that is deeply committed to vertically integrated engineering, testing, prototyping, and manufacturing. Joby is developing much of the aircraft in-house, which has allowed Joby to develop systems and components that are specifically engineered for their intended applications. The innovations that Joby has produced are supported by extensive proprietary intellectual property.

28. For commercial use, Joby's eVTOL aircraft will be installed with air data probes—aviation equipment that is installed on the exterior of an aircraft that provides air data information to the aircraft's air data computer, forming an air data system.

29. The commercial use-case of Joby's eVTOL aircraft has specific system-level requirements, including the air data system. Thus, to be approved for commercial

use, Joby's air data system will need to meet certain specifications so that the Joby eVTOL aircraft can pass regulatory certifications.

**B. TransDigm acquires Aerosonic in a bid to jack up prices for customers.**

30. TransDigm, which was founded in 1993, manufactures a wide variety of aerospace components. Upon information and belief, approximately 80% of sales come from parts for which it is the sole source provider, and TransDigm's operating margins exceed 40%.

31. TransDigm exclusively licenses or acquires designs from aerospace and defense manufacturers, "positioning the company as a one-stop shop for hard-to-find replacement parts for planes and other equipment throughout the useful lives of the aircraft."[4]

32. Upon information and belief, TransDigm's products are sold in two key segments: original equipment manufacturing ("OEM"), which refers to production of parts or components that are used in the final assembly of a larger product, and aftermarket, which refers to distributing mission-critical parts to planes that need them as part of ordinary maintenance.

33. Upon information and belief, these two streams, the OEM and aftermarket businesses, are linked: a robust OEM market cultivates a large aftermarket. The more market share TransDigm is able to claim in the OEM market

---

[4] Supplemental Memorandum on Actions by TransDigm, United States House of Representatives Committee on Oversight and Reform (May 15, 2019), *available at* 2019-05-15.COR Supplemental Memo-5-15-19 Hearing DOD IG Rept. on Excess Profits by TransDigm Group Inc_.pdf.

by selling its components directly to institutions like Boeing and the U.S. military, the larger TransDigm's aftermarket share becomes, as those institutions continue to service and replace their parts over the 25 to 30 year lifecycle of an aircraft.

34. Federal Aviation Administration regulations prohibit planes from taking off if they do not possess these "mission-critical" parts. Upon information and belief, because TransDigm is the sole provider of more than 80% of its products, third-party aviation customers have little choice but to purchase products from TransDigm and its subsidiary companies.

35. The combination of TransDigm being the sole provider of the vast majority of its products and the fact that the FAA requires the inclusion and maintenance of several products manufactured by TransDigm's subsidiaries leads to a virtual chokehold over customers.

36. The U.S. Department of Defense admits that the U.S. federal government has very little negotiating leverage and typically must accept TransDigm's offered price.[5]

37. After independently obtaining the cost data for fifteen contracts, the DOD Inspector General found that TransDigm made excess profit in all fifteen to the tune of $2.6 million.[6]

---

5 "A Comparison of DOD and Commercial Airline Purchasing Practices," United States General Accounting Office, http://www.gao.gov/230/228420.pdf.

6 Supplemental Memorandum, *supra* n.1 at 6.

38. TransDigm also reportedly achieves most of its growth through acquisitions. By 2019, it had acquired more than 70 businesses or product lines over just the 25 years it had been in existence.

39. TransDigm's own history is steeped in private equity investment. Upon information and belief, TransDigm itself was private-equity owned from its founding in 1993 until its IPO in 2006.

40. This history has reportedly contributed to TransDigm's philosophy and approach to expansion: some observers have referred to TransDigm as essentially an aerospace private equity shop embedded in a highly profitable industrial company. "It's a large holding company that searches for specialty parts used in heavy machinery—unique panels, connectors, cables, and other components—that are produced exclusively by a single company. TransDigm buys those producers and Pharma Bros them, dramatically inflating the price to exploit their monopoly."[7]

41. It is in this vein that TransDigm exercises oversight over its acquisitions. As Brad Pederson, former CEO of TransDigm subsidiary Breeze-Eastern explained, TransDigm "went through every contract at Breeze-Eastern and raised the price where possible."[8]

42. A March 2017 *Huffington Post* article apparently described TransDigm as

---

[7] Supplemental Memorandum, *supra* n.1 at 4-5.

[8] Supplemental Memorandum, *supra* n.1 at 4.

"essentially the Martin Shkreli of defense contractors."[9]

43. It is against this backdrop that, in 2013, TransDigm acquired all of Aerosonic's outstanding shares in a deal worth $39 million—well over Aerosonic's total revenues for FY 2013 and at a price that was higher than Aerosonic's total enterprise value.

44. At the time of Aerosonic's acquisition, TransDigm's then-CEO Nick Howley publicly revealed the company's motivations for the acquisition. Namely, TransDigm was particularly attracted to Aerosonic's "highly engineered, proprietary air data sensing test and display components for use primarily in the business jet, helicopter and military markets. . . . About 55% of total revenue is derived from the commercial market and 60% from the aftermarket." Howley specifically touted Aerosonic as "fit[ting] well with our overall business strategy."[10]

45. As Doug Hillman, then-CEO of Aerosonic explained, "TransDigm management used a 'one-two punch' after acquiring a company. It involves two actions: one, raising prices, and two, cutting costs. They cut costs by firing employees. The metric they used was 'revenue per head.'"[11]

46. TransDigm's then-chief financial officer explained in 2019, the company

---

[9] *Id.*

[10] TransDigm press release, "TransDigm Group Incorporated and Aerosonic Corporation Announce Acquisition Agreement," *Business Wire* (Apr. 22, 2013).

[11] Supplemental Memorandum, *supra* n.1 at 4.

uses a model of what it calls "value-based pricing," which is as a former sales director explained "code for raising prices."[12]

47. As Hillman revealed, TransDigm dictated an exploitative approach to pricing once it acquired a company: "Their direction was to pursue value pricing where value was defined as pushing prices to the point of near customer revolt to divert more value to TransDigm."[13] This, Hillman explained, "punish[ed] your customers instead of working with them to secure long term relationships, reasonable profitability, and growth."[14]

48. A former Assistant Secretary of Defense for Acquisition, Kevin Fahey, once put it bluntly: "Is what TransDigm is doing illegal? No. Do I consider gouging our taxpayers for excessive costs immoral and unconscionable in the face of getting our warfighters what they need to fight? Yes."[15]

### C. Aerosonic specializes in aviation instrumentation and avionics equipment.

49. Aerosonic's products measure air pressure and convert that into useful information that enables safe aircraft operation—in essence, it develops products that comprise components of air data systems.

---

12 Supplemental Memorandum, *supra* n.1 at 8.

13 Supplemental Memorandum, *supra* n.1 at 8.

14 Supplemental Memorandum, *supra* n.1 at 6.

15 Capaccio, T., *Pentagon Rips TransDigm for 'Gouging' Taxpayers with $4,361 Metal Pin*, Bloomberg (May 15, 2019), *available at* https://fortune.com/2019/05/15/transdigm-pentagon-gouging/.

50. Upon information and belief, Aerosonic's first product offerings were mechanical instruments like airspeed indicators and altimeters. In the 1990s, the company expanded its offerings to multifunction probes, angle-of-attack sensors, and stall-warning transmitters.

51. Upon information and belief, by 2013, Aerosonic's four largest customers were the United States government, a South Korean aerospace and defense company, Carp Industries (a spare parts distributor), and the Boeing Company.

52. However, at that time, Aerosonic was in financial peril. While revenue growth had reportedly been largely flat since 2009, net income had varied significantly due to fluctuating research and development expenditures.

53. By January 2013, Aerosonic was struggling to maintain liquidity because it was unable to "efficiently process orders, ship finished goods, and collect receivables" to the point where Aerosonic had no cash or cash equivalents on its balance sheet.[16]

54. Upon information and belief, and in the time since it was acquired by TransDigm, Aerosonic now has in the pipeline designs for multifunction probes to be used for eVTOLs, unmanned aerial vehicles, and other nontraditional aircraft.

55. Upon information and belief, Aerosonic boasts the major manufacturers of civil, military, and business fixed-wing and rotorcraft platforms, including all branches of the U.S. military forces, as its clients.

[16] Aerosonic 10-K 2013, p. 23.

### D. Joby explores using Aerosonic as a supplier of air data probes for Joby's commercial fleet.

56. As it was developing its eVTOL, Joby had two options for sourcing its air data system components: outsourcing the components from other suppliers or creating and developing those components in-house.

57. Over a period of many years leading up to the fall of 2021, Aerosonic shared with Joby air data system documents and components without any obligation of confidentiality.

58. For example, Aerosonic sent Joby datasheets and engineering drawings describing its air data parts, and in August 2020, a 5-hole air data probe, again all without any obligation of confidentiality.

59. Before Joby had purchased anything from Aerosonic, and for the purpose of evaluating a potential business relationship, on or about September 21, 2021, Joby and Aerosonic executed—for the first time—a nondisclosure agreement to "be governed by the laws of the State of California without regard to the conflicts of law provisions thereof."

60. This nondisclosure agreement governed only the discussions and information exchanged while Joby and Aerosonic were considering and negotiating entering into a business relationship. Importantly, this nondisclosure agreement was an interim agreement—it was designed to ensure that information exchanged between Aerosonic and Joby would be protected while the parties were evaluating whether to enter into any future contractual relationship. The NDA does not include: the

identification of a buyer or seller, a detailed description of the goods or services, the agreed-upon price and payment terms, the transfer of title for purchased goods, delivery specifications, or any warranties or guarantees provided.

61. The nondisclosure agreement did not expressly prohibit Joby from competing with Aerosonic.

62. The nondisclosure agreement does not require that Aerosonic be the exclusive supplier or developer for Joby, or that Aerosonic would be a supplier or developer at all.

63. In September 2021, Joby and Aerosonic met to review Aerosonic's air data systems.

64. At first, Aerosonic wanted to sell Joby air data probes and air data computers that Aerosonic already had in stock as a commercial off-the-shelf ("COTS") solution.

65. On information and belief, TransDigm had fired Aerosonic employees after the acquisition such that Aerosonic's in-house engineering capability was limited.

66. But Aerosonic's COTS air data probes and air data computers did not meet Joby's long-term commercial requirements. At a minimum, therefore, Aerosonic's COTS solutions would have to be modified to meet Joby's long-term commercial requirements.

67. Nevertheless, Joby did believe that Aerosonic's COTS solutions could be useful in testing Joby's eVTOL aircraft.

**E. Joby purchases COTS Aerosonic air data probes and related documents and data to test Joby's eVTOL aircraft.**

68. To test Joby's eVTOL aircraft, Joby purchased a limited quantity of Aerosonic's COTS air data probes and related materials.

69. Both Aerosonic and Joby were well informed that these purchases were not to test Aerosonic's air data probes for Joby's long-term commercial use, but strictly to help test Joby's eVTOL aircraft.

70. For example, Joby would be required, across Joby's fleet of eVTOL aircraft, to complete thousands of hours of test flights in public and military airspace before entering the commercial space.

71. On information and belief, Aerosonic was aware of both the short-term and public nature of Joby's intended use for the subsequently purchased air data probe.

72. Joby has purchased air data probes from other suppliers to perform the same tests of the eVTOL aircraft as well.

73. Joby's purchases of Aerosonic's COTS materials were made pursuant to sales contracts, and not pursuant to the NDA.

74. In late September 2021, Aerosonic provided a quote to Joby for COTS air data probes and air data computers, and an air temperature sensor to be used to help Joby test its aircraft, which included a reference link to Aerosonic's terms and conditions for the sale of goods.

75. On October 13, 2021, Joby sent a purchase order to Aerosonic for four of Aerosonic's COTS (SLZ8400-2) air data probes. Dkt. 53-2.

76. Joby's terms and conditions sent with the purchase order include a California choice of law provision and a California forum selection clause.

77. Joby sent purchase orders (PO-004011 and PO-005693) to Aerosonic for related documents and data concerning the purchased air data probes. Dkt. 53-2.

78. Joby received the four Aerosonic COTS air data probes that Joby ordered in October 2021, months after the specified delivery date.

79. Aerosonic sent a quote to Joby on May 5, 5022 for an additional 15 COTS air data probes. Aerosonic's quotes were sent with Aerosonic's terms and conditions for the sale of goods. Dkt. 53-3.

80. On June 15, 2022, Joby sent a purchase order to Aerosonic for six COTS (SLZ8400-2) air data probes. Dkt. 53-2. Joby's terms and conditions sent with the purchase order include a California choice of law provision and a California forum selection clause.

81. Both Aerosonic's and Joby's terms and conditions state that they supersede all prior agreements.

82. The sales contracts govern Joby's use of purchased Aerosonic air data probes and other purchased items.

83. Joby received the six Aerosonic COTS air data probes in two deliveries months after the specified delivery date.

84. On June 28, 2023, Joby equipped an eVTOL aircraft with three of the COTS air data probes purchased from Aerosonic.

### F. Aerosonic effectively "no bids" Joby on developing commercial air data probes.

85. Because Aerosonic's COTS air data probes and air data computers did not meet Joby's long-term commercial requirements, at a minimum, they would have to have been modified. In March 2022, Joby asked Aerosonic to bid on supplying Joby with a modified air data probe that would meet Joby's requirements for commercial use.

86. Even at this time, Joby was concerned that Aerosonic did not have sufficient engineering talent and expertise in-house to be able to meet these requirements—especially after Aerosonic had been acquired by TransDigm and had been subject to the mass staff cuts that TransDigm imposed.

87. In addition to raising concerns for Joby that Aerosonic lacked the engineering expertise to develop the necessary air data probes, Aerosonic also effectively "no bid" Joby's request by jacking up the price for such a bespoke air data probe. This seemed to be in line with TransDigm's direction that its subsidiaries ensure that they are the only game in town and then charge absurdly high prices for their product while their customers are left with no other choice.

88. This no bid led to a breakdown in communications between Joby and Aerosonic.

89. Seeking an alternative to Aerosonic's no bid, in early April 2022, Joby began to explore the feasibility of developing a bespoke air data probe in-house.

## G. Joby develops its own air data probes

90. For Joby, considering the development of its own bespoke air data probe made sense. Its business model is premised on capturing value through vertical integration, specifically because the eVTOL aircraft that it was developing is so unique. From the company's inception, Joby had to, from the get-go, engineer many of its own parts in-house. For example, its flight control computer and direct drive electronic propulsion unit are all bespoke, made in-house, specifically to meet Joby's eVTOL requirements.

91. While designing and manufacturing every component in-house would normally be a time-consuming and expensive task for any company, Joby was able to leverage several unique capabilities and innovative techniques to achieve efficiency.

92. Chief among them was Joby's in-house additive manufacturing (also known as 3D printing) capability, which allowed Joby to implement a rapid prototype and development strategy.

93. In addition, Joby invested in creative ways to rapidly implement and test its bespoke components and, through iterative processes, was able to nimbly adjust and improve upon its designs such that it would be able to quickly create components that would work for its eVTOL aircraft.

94. The result of Joby engineering bespoke components in-house is that those designs performed better than conventional offerings in a smaller footprint and often times with fewer parts.

95. Joby also engaged the services of a consultant, a recognized expert in the

field of air data systems, to assist it with developing its own air data probe and who was already familiar with decades of technical literature describing air data systems and multi-function air probes.

96. Together, they determined that Joby had the in-house capabilities to design, develop, and test air data probes.

97. Joby's in-house additive manufacturing capabilities allowed Joby to implement a rapid prototype and development strategy for its air data probes. But, the use of this additive manufacturing technology selected by Joby also required that Joby implement materials and engineering techniques that are not present in the conventional manufacture of air probes. For example, the use of additive manufacturing technology required that Joby use titanium to manufacture its air data probe, even though other materials would have been more robust from a thermal standpoint. And it caused Joby's air data probes to have internal passageways (called plenums) that are designed to account for the need to leave paths for the powder used in 3D printing to get out (a process called depowdering). The use of this technology also introduced other unique design constraints—like minimum wall thicknesses—that are not present in traditionally manufactured air data probes.

98. Joby also invested in its own wind tunnel to be used to test and collect data from its prototype air data probes and assist with quickly adjusting its prototype probes to meet Joby's long-term commercial needs.

99. By using this superior engineering and testing methodology, Joby was able to develop an air data probe that was sufficient for testing purposes (not

necessarily to serve Joby's long-term commercial needs) by March 2024.

100. Along the way, however, Joby had to create at least nine different versions of its air data probe before it was able to create a version that was sufficient for testing purposes.

101. Joby also had to consult with air data systems experts, public papers and requirements, and engage a separate consulting firm to ensure that Joby's air data probe met the appropriate de-icing requirements. This engagement has ensured that Joby's air data probes meet the company's requirements for long-term commercial use.

102. Since March 2024, Joby has continued to iterate and develop its air data probe to ensure that Joby's eVTOL can be certified for commercial use—and continues to do so today.

**H. Joby receives cease-and-desist letters.**

103. It had been almost two years since negotiations between Aerosonic and Joby had broken down and it had become clear at that time that the two companies would not move forward with a business relationship, though Joby would still use the purchased air data probes for Joby's eVTOL aircraft flight tests.

104. Still, in a letter dated July 31, 2024, Abe Khoury, president of Aerosonic, asked that Joby "immediately stop using Aerosonic's trade secrets and claiming them as its own," "immediately cease and desist using Joby's version of Aerosonic's probe," "provide an accounting of all sales of aircraft including those probes," and "return all Aerosonic confidential and/or proprietary information in Joby's possession (or provided to third parties)." Mr. Khoury acknowledged that "Aerosonic delivered

approximately 10 SLZ840 probes for Joby's 'flight test' aircraft."

105. Joby responded in a letter dated August 28, 2024. Joby denied wrongdoing and explained "Joby possesses state-of-the-art manufacturing capabilities in-house which allows Joby to rapidly prototype, test, and refine our proprietary designs." In addition, Joby noted that it "independently designed, developed, and produced its air data probes over the course of several years to fit Joby's unique needs and to be compatible with Joby's proprietary systems and aircraft." Still, it committed to "returning all Aerosonic confidential and/or proprietary information in Joby's possession (or provided to third parties) required by Section 3 of the MNDA."

106. Joby also "formally request[ed] similarly that Aerosonic return all Joby confidential and/or proprietary information in Aerosonic's possession (or provided to third parties) as required by Section 3 of the MNDA."

107. On December 5, 2024, Joby received a response, this time on TransDigm letterhead from a TransDigm employee (who is, on information and belief, Associate General Counsel at TransDigm). TransDigm's counsel claimed he "struggle[d] to understand your claim," asserting his view that Joby's air data probes "appear to be nearly identical to the proprietary information that Aerosonic provided to Joby." He demanded that Joby "return all Aerosonic confidential and proprietary material in [its] possession immediately." He further stated that "Aerosonic requests that Joby return all 10 Aerosonic probes delivered between 2022 and 2023" for a refund. He noted for Joby that "IP litigation is complex and expensive." On May 16, 2025, outside counsel for Aerosonic sought return of eight different categories of documents and

information, including models, drawings, test reports, test procedures, and wind tunnel data.

108. On May 22, 2025, outside counsel for Joby explained to outside counsel for Aerosonic that the information Joby had purchased was essential to ensuring that Joby could continue to test its aircraft and, as a result, could not be returned to Aerosonic.

109. On May 30, 2025, to avoid dispute, outside counsel for Joby memorialized this conversation and offered to identify and quarantine all documents Aerosonic sent to Joby other than the probes and information that Joby purchased for ongoing testing of the aircraft.

110. At the same time, Joby also requested again that Aerosonic follow the same procedure and return information that Joby and provided to Aerosonic.

111. Information readily available in the public domain shows that Aerosonic's, Joby's, and other suppliers' air probes all look similar. Thus, misappropriation cannot be inferred from similarity in appearance.

112. On information and belief, one of TransDigm's employees and counsel is directing Aerosonic's claims against Joby.

113. For example, during recent negotiations over a confidentiality stipulation, Aerosonic identified TransDigm's employee and counsel as the sole lawyer that Aerosonic would designate as able to view Joby's Confidential-Attorneys' Eyes Only material in this case. When Joby raised questions about TransDigm's counsel's involvement with not just this case but other TransDigm subsidiaries,

Aerosonic confirmed in mid-August 2025 that TransDigm's counsel advises TransDigm and all of its subsidiaries/business units.

114. And Aerosonic stated that if TransDigm's counsel could not be given access to Joby's Confidential-Attorneys' Eyes Only material in this case, then Aerosonic would demand the parties remove the provision allowing for a single in-house lawyer from each side to view the other parties' Confidential-Attorneys' Eyes Only material in this case. In other words, Aerosonic stated it was TransDigm's counsel or nobody.

115. Joby has committed significant time and resources to exploring options to comply with Aerosonic's and TransDigm's demands of removing or returning the air data probes and information while continuing to try and meet its contractual obligations to its customers, including the U.S. government.

**I. Joby discovers defects with Aerosonic's COTS air data probes.**

116. On April 8 and April 9, 2025, Joby uncovered a defect on two air data probes (serial numbers AS06221180 and AS03227817) installed on Joby's aircraft SN5 during pre-flight testing, requiring cancellation of a test flight. The outer sleeve of the Aerosonic air data probes detached from their proper position.

117. When the outer sleeve of Aerosonic's air data probe detaches from its proper position, the air data readings become unreliable.

118. Unreliable air data readings can be dangerous.

119. The detachment of these sleeves renders the air data probes unfit for use even for testing Joby's eVTOL aircraft and forced Joby to replace those probes.

120. If not promptly identified and remedied, the outer sleeve of Aerosonic's air data probe detaching from its proper position could impair or otherwise negatively impact Joby's contract with the United States Air Force.

121. Upon information and belief, the detachment of these sleeves is caused by a defect in the design or manufacturing of the Aerosonic probes.

**J. Joby notifies Aerosonic of breach.**

122. On June 5, 2025, Joby, through its outside counsel, notified Aerosonic (through its outside counsel) that Aerosonic was in breach by selling Joby defective air data probes. Joby demanded Aerosonic to compensate Joby for Aerosonic's breach, and Aerosonic has not agreed to do so.

## CLAIMS FOR RELIEF

### FIRST COUNTERCLAIM
**(Breach of contract against Aerosonic)**

123. Joby re-alleges paragraphs 68-84 and 103-122 here.

124. All conditions precedent to bringing this claim have occurred or been performed.

125. Joby and Aerosonic formed sales contracts for the sale of ten air data probes from Aerosonic to Joby.

126. Aerosonic is a merchant with respect to air data probes.

127. These contracts were valid, binding, and enforceable. In other words, both parties were capable of contracting, both parties consented, the contracts had lawful objects, and there was sufficient cause or consideration.

128. These contracts contained an implied warranty of merchantability.

129. These contracts contained an implied warranty of fitness for a particular purpose.

130. Joby performed all of its obligations under the contracts.

131. Joby and Aerosonic's terms and conditions disagree with respect to warranties, and Joby did not disclaim implied warranties in the sales contracts.

132. Terms in Aerosonic's terms and conditions are knocked out of the sales contracts by Joby's competing terms and conditions. The sales contracts do not include an express disclaimer of implied warranties.

133. The warranty provision in the sales contracts is the UCC gap-filler provision, which is added by operation of law. The warranty provision in Aerosonic's terms and conditions does not apply to the sales contracts.

134. Aerosonic breached the implied warranty of merchantability of the contracts by providing Joby air data probes that would not pass without objection in the trade, were not fit for the ordinary purposes for which such goods are used, were not adequately contained, packaged, or labeled, and/or did not measure up to the promises or facts stated on the container or label.

135. Aerosonic breached the implied warranty of fitness for a particular purpose of the contracts by providing Joby air data probes that were not fit for the particular needs of the buyer while Aerosonic had reason to know the particular purpose for which Joby required the air data probes and Joby relied on the skill and judgment of Aerosonic to select and furnish suitable goods.

136. Joby notified Aerosonic of the breaches within a reasonable time after Joby discovered the breaches. Joby discovered the breaches on or about April 8-9, 2025, and Joby notified Aerosonic of the breaches in writing on June 5, 2025. Aerosonic refused to confirm that it would cure the breaches.

137. Joby and Aerosonic's terms and conditions disagree with respect to conditions precedent. The conditions precedent listed in Aerosonic's terms and conditions are not part of the sales contracts.

138. As a direct, foreseeable, and proximate result of Aerosonic's breach of the contracts, Joby has been and/or will be harmed.

139. As a direct, foreseeable, and proximate result of Aerosonic's breach of the contracts, Aerosonic has been and/or will be unjustly enriched.

## SECOND COUNTERCLAIM
**(Breach of contract against Aerosonic only)**

140. Joby re-alleges paragraphs 56-67, 85-115, and 122 here.

141. All conditions precedent to bringing this claim have occurred.

142. Joby and Aerosonic entered into an NDA to explore the formation of a business relationship in 2021.

143. The NDA is valid, binding, and enforceable. In other words, both parties were capable of contracting, both parties consented, the NDA had lawful objects, and there was sufficient cause or consideration.

144. Joby performed all of its obligations under the NDA.

145. In August 2024, Joby sought the return of all confidential and/or

proprietary information in Aerosonic's possession (or provided to third parties) as required by Section 3 of the NDA. Aerosonic did not agree to do so.

146. In May 2025, again, Joby sought return of all confidential and/or proprietary information in Aerosonic's possession (or provided to third parties). Again, Aerosonic did not agree to do so.

147. As a result, Aerosonic has breached the NDA by continuing to use Joby's confidential and proprietary information without authorization.

148. Joby notified Aerosonic of the breaches and provided Aerosonic reasonable opportunity to return the confidential and/or proprietary information.

149. As a direct, foreseeable, and proximate result of Aerosonic's breach of the NDA, Joby has been and/or will be harmed.

150. As a direct, foreseeable, and proximate result of Aerosonic's breach of the NDA, Aerosonic has been and/or will be unjustly enriched.

## THIRD COUNTERCLAIM
**(Violation of Cal. Bus. & Prof. Code § 16600 et seq. against Aerosonic and TransDigm pleaded in the alternative)**

151. Joby re-alleges paragraphs 25-84, 103-115 here.

152. Joby is engaged in the lawful business of developing, manufacturing, and testing its eVTOL aircraft. In order to do so, it must use air data probes as a component to develop and test its eVTOL aircraft. To further this goal, Joby purchased ten air data probes from Aerosonic.

153. Both Aerosonic and TransDigm sent Joby cease-and-desist letters that

demanded that Joby cease using any of the purchased probes and other materials for any purpose other than to evaluate a business relationship.

154. Aerosonic then doubled down in the allegations in its complaint before this Court that Joby has breached the NDA by failing to "immediately turn over Aerosonic's Proprietary Information, despite Aerosonic's repeated and express requests in writing." Dkt. 45 ¶ 145.

155. Under the NDA, then, Joby would not be permitted to use any of the purchased materials anymore.

156. For example, under the NDA, Joby would not be permitted to use the information purchased under the purchase orders to install the air data probes onto Joby's aircraft.

157. Joby would also not be permitted to use the air data probes to continue testing Joby's eVTOL.

158. This interpretation is also consistent with TransDigm's direction to its subsidiaries, including Aerosonic, to ensure that Aerosonic maximizes its ability to provide air data probes in the original manufacturing market and aftermarket such that Aerosonic can jack up its pricing and still face little consequence.

159. Aerosonic and TransDigm are pushing this interpretation of the NDA despite having been repeatedly informed by Joby that continued use of the purchased information and probes are essential to allowing Joby to continue to test its aircraft and conduct its business. Still, Aerosonic and TransDigm have ignored these explanations and continue to press an interpretation of the NDA that would cripple

Joby's ability to pursue its legitimate business practice.

160. The NDA as so construed prohibits Joby from using the purchased probes to test its eVTOL aircraft constitute a restraint on Joby's ability to engage in its lawful business.

161. Aerosonic's and TransDigm's restraint is not a legitimate protection of a trade secret, but rather a direct attempt to hinder Joby's ability to pursue its legitimate business operation.

162. The cause to stop Joby from developing its own air probes is even more acute for TransDigm since Joby also has contracts with the U.S. armed forces. On information and belief, TransDigm views Joby as a threat to its own single-source government contracts—particularly when the federal government is aware of and sensitive to TransDigm's exploitative practices and keen on finding alternative sources.

163. The effects of the restraint outweigh any purported benefits.

164. Aerosonic's and TransDigm's actions are not intended to protect a legitimate business interest but are designed to cause harm by preventing Joby from engaging in its legitimate business practice.

165. Aerosonic's and TransDigm's restraint harms consumers and innovation by limiting the development of new products and services in the eVTOL market.

166. As a direct and proximate result of Aerosonic's and TransDigm's unreasonable restraint, Joby has or will suffer actual damages, including but not limited to, monetary loss, delay in product development, and harm to its business

reputation.

## FOURTH COUNTERCLAIM
## (Violation of Cal. Bus. & Prof. Code § 17200 et seq. against Aerosonic and TransDigm pleaded in the alternative)

167. Joby re-alleges paragraph 25-84, 103-115 here.

168. Aerosonic's and TransDigm's conduct constitutes an unfair business act or practice because it violates the policy and spirit of California law and significantly threatens and harms competition.

169. Specifically, Aerosonic's and TransDigm's cease-and-desist letters, which insist that the NDA demands a blanket prohibition on Joby's use of purchased probes and drawings for legitimate business purposes is a naked restraint on trade that has no legitimate justification.

170. This interpretation of the NDA is also consistent with TransDigm's direction to its subsidiaries, including Aerosonic, to ensure that Aerosonic continues to maximize its ability to provide air data probes in the original manufacturing market and aftermarket such that Aerosonic can jack up its pricing and still face little consequence.

171. Aerosonic's and TransDigm's actions attempt to unfairly harm Joby and exclude it from the lawful business of developing and testing eVTOL aircraft, creates a barrier to entry for Joby, inhibits innovation and product development in the eVTOL market, and reduces consumer choice and technological advancement.

172. In addition, Aerosonic and TransDigm engaged in a deceptive business

act or practice by selling probes and associated information to Joby while concealing their intent to prohibit Joby from using the products for their intended purpose.

173. Aerosonic's and TransDigm's acts of selling the probes to Joby without disclosing their prohibitive interpretation of the NDA at the time the parties were negotiating it was a material omission. A reasonable business, like Joby, would not have purchased the probes and other information if it had known that it was legally prohibited from using them to test its aircraft.

174. Aerosonic and TransDigm are pushing their interpretation of the NDA despite having been repeatedly informed by Joby that continued use of the purchased information and probes are essential to allowing Joby to continue to test its aircraft and conduct its business. Still, Aerosonic and TransDigm have ignored these explanations and continue to press an interpretation of the NDA that Joby never would have agreed to and that would cripple Joby's ability to pursue its legitimate business practice.

175. Aerosonic's and TransDigm's omissions were likely to deceive and, in fact, did deceive Joby. By selling the probes and other information under the guise that they could be used for Joby's intended and legitimate business purpose, Aerosonic and TransDigm induced Joby to purchase the products and to rely on a misrepresented legal and factual situation.

176. As a direct and proximate result of Aerosonic's and TransDigm's unfair and deceptive acts and practices, Joby has suffered and will suffer in fact and has and will lose money or property, including through delays in product development and

damages to its business and reputation.

## PRAYER FOR RELIEF

1. Joby respectfully requests that the Court enter judgment in favor of Joby and against Aerosonic and TransDigm and grant relief as follows:

a. Judgment for Joby and against Aerosonic and TransDigm on all counts;

b. Judgment that Aerosonic is liable for breach of the sales contracts;

c. Judgment that Aerosonic is liable for breach of the NDA;

d. Declaratory relief that the NDA, as interpreted and enforced by Aerosonic and TransDigm, is void and unenforceable under Cal. Bus. & Prof. Code § 16600 et seq.;

e. Declaratory relief that the NDA, as interpreted and enforced by Aerosonic and TransDigm, is void and unenforceable under Cal. Bus. & Prof. Code § 17200 et seq.;

f. Permanent injunction prohibiting Aerosonic and TransDigm from enforcing the NDA or taking any other action to restrain Joby's ability to engage in its lawful business;

g. Permanent injunction prohibiting Aerosonic and TransDigm from engaging in any future unfair or deceptive business acts or practices against Joby;

h. Actual damages in an amount to be proven at trial;

i. Specific performance of the NDA;

j. Restitution, lost profits, actual loss, unjust enrichment, and disgorgement of profits;

k. Joby's reasonable attorneys' fees and costs;

l. Exemplary or punitive damages;

m. Pre-judgment and post-judgment interest; and

n. Any and all other relief that the Court deems proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Counterclaims Plaintiff Joby demands trial by jury in this action on all claims and issues so triable.

Respectfully submitted,

By: */s/ Mark Thomas Smith*

Paul Thanasides
Florida Bar No.: 103039
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Hillary Thornton
Florida Bar No.: 1018229
hthornthon@mcintyrefirm.com
McIntyre Thanasides Bringgold
Elliott Grimaldi & Guito, P.A.
1228 E. 7th Avenue, Suite 100,
Tampa, FL 33605
Telephone: 813.223.0000
Facsimile: 813.225.1221

Naveen Modi, *PHV forthcoming*
naveenmodi@paulhastings.com
Jeff Pade
jeffpade@paulhastings.com

Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1990

Rob Unikel
robertunikel@paulhastings.com

Mark Thomas Smith
marksmith@paulhastings.com
Summer Stevens
Summerstevens@paulhastings.com
Paul Hastings LLP
71 S. Wacker Drive, Forty-Fifth Floor
Chicago, IL 60606
Telephone: (312) 499-6000

***Counsel for Defendant and Counterclaims Plaintiff Joby Aero, Inc.***

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on September 12, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*<u>/s/ Mark Thomas Smith</u>*
Mark Thomas Smith