UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AEROSONIC LLC,

    Plaintiff,

v.                                Case No. 8:25-cv-554-VMC-AAS

JOBY AERO, INC.,

    Defendant.

JOBY AERO, INC.,

    Counterclaim-Plaintiff,

v.

AEROSONIC LLC and
TRANSDIGM GROUP INC.,

    Counterclaim-Defendants.
_____/

## ORDER

This matter comes before the Court pursuant to Counterclaim-Defendants Aerosonic LLC and TransDigm Group Inc.'s Motion to Dismiss Counterclaims (Doc. # 109), filed on November 7, 2025. Counterclaim-Plaintiff Joby Aero, Inc. responded on November 28, 2025. (Doc. # 119). For the reasons that follow, the Motion is granted in part and denied in part.

1

## I. **Background**

This case arises from a business dispute between Aerosonic and Joby. Aerosonic brought this action against Joby in March 2025. (Doc. # 1). Joby filed an Answer, Affirmative Defenses, and Counterclaim against Aerosonic and Aerosonic's parent company, TransDigm (Doc. # 71), which it subsequently amended. (Doc. # 97).

Joby's amended counterclaim includes five causes of action: (1) breach of contract against Aerosonic regarding the sales contracts; (2) breach of contract against Aerosonic regarding the NDA; (3) violation of Cal. Bus. & Prof. Code § 16600 against Aerosonic and TransDigm pleaded in the alternative; (4) Violation of Cal. Bus. & Prof. Code § 17200 against Aerosonic and TransDigm pleaded in the alternative; and (5) for a declaratory judgment that the trade restraint and unlawful competition restraint provisions of the NDA, as interpreted by Aerosonic and TransDigm, are void and unenforceable. (Id.).

The following factual background is taken from the amended counterclaim. Joby is developing an all-electric, vertical takeoff and landing ("eVTOL") aircraft, which requires the use of air data probes. (Id. at ¶ 3). Aerosonic sells air data probes. (Id. at ¶ 4). "Over a period of many

2

years leading up to the fall of 2021, Aerosonic shared with Joby air data system documents and components without any obligation of confidentiality." (Id. at ¶ 58). "Before Joby had purchased anything from Aerosonic, and for the purpose of evaluating a potential business relationship, on or about September 21, 2021, Joby and Aerosonic executed — for the first time — a nondisclosure agreement ('NDA') to 'be governed by the laws of the State of California without regard to the conflicts of law provisions thereof.'" (Id. at ¶ 60). "The nondisclosure agreement did not expressly prohibit Joby from competing with Aerosonic" and did "not require that Aerosonic be the exclusive supplier or developer for Joby, or that Aerosonic would be a supplier or developer at all." (Id. at ¶¶ 62-63).

From October 2021 to June 2022, Joby purchased ten "off-the-shelf" air data probes from Aerosonic to use in testing its eVTOL. (Id. at ¶¶ 69-81). These purchases were made pursuant to sales contracts — not the earlier NDA — and the sales contracts allegedly contain a term that "they supersede all prior agreements." (Id. at ¶¶ 74, 82-83). Subsequently, Joby sought a bid from Aerosonic for custom air data probes to meet Joby's specific needs. (Id. at ¶ 87). Aerosonic submitted what Joby considered an exorbitantly high bid to

3

which Joby would not agree, and which "led to a breakdown in communications between Joby and Aerosonic." (Id. at ¶¶ 89-90).

Joby then began developing its own custom air probes in April 2022. (Id. at ¶ 91). "Joby was able to develop an air data probe that was sufficient for testing purposes (not necessarily to serve Joby's long-term commercial needs) by March 2024" and has continued developing that air probe thereafter. (Id. at ¶¶ 92-104).

Having learned of Joby's in-house development of its own air probe, Aerosonic sent Joby a cease-and-desist letter in July 2024. (Id. at ¶ 106). Aerosonic asked that Joby "immediately stop using Aerosonic's trade secrets and claiming them as its own," "immediately cease and desist using Joby's version of Aerosonic's probe," "provide an accounting of all sales of aircraft including those probes," and "return all Aerosonic confidential and/or proprietary information in Joby's possession (or provided to third parties)." (Id.).

In its August 2024 response letter, Joby denied wrongdoing, telling Aerosonic that Joby had "independently designed, developed, and produced its air data probes over the course of several years to fit Joby's unique needs and to be compatible with Joby's proprietary systems and aircraft"

4

but that it would return all Aerosonic's proprietary information required by the NDA. (Id. at ¶ 107). In December 2024, a response nominally from Aerosonic, but printed on TransDigm letterhead and signed by one of TransDigm's in-house counsel, was sent to Joby. (Id. at ¶ 109). Among other things, that letter demanded Joby "return all Aerosonic confidential and proprietary material in [its] possession immediately" as well as "all 10 Aerosonic probes delivered between 2022 and 2023," in exchange for a refund. (Id.). Joby informed Aerosonic and TransDigm "that the information Joby had purchased [through the sales contracts] was essential to ensuring that Joby could continue to test its aircraft and, as a result, could not be returned to Aerosonic." (Id. at ¶ 110).

In early April 2025, after Aerosonic had filed its claims against Joby in this Court, "Joby uncovered a defect on two air data probes (serial numbers AS06221180 and AS03227817) installed on Joby's aircraft SN5 during pre-flight testing, requiring cancellation of a test flight. The outer sleeve of the Aerosonic air data probes detached from their proper position." (Id. at ¶ 118). Because the detachment renders the air data probe's readings unreliable, the "detachment of these sleeves renders the air data probes unfit for use even

5

for testing Joby's eVTOL aircraft and forced Joby to replace those probes." (Id. at ¶¶ 119-121).

"On June 5, 2025, Joby . . . notified Aerosonic . . . that Aerosonic was in breach by selling Joby defective air data probes." (Id. at ¶ 124). This notice was sent five days before Joby filed an action against Aerosonic in a federal court in California. See Joby Aero, Inc. v. TransDigm Group Inc., No. 5:25-cv-04912 (N.D. Cal. June 10, 2025). Joby subsequently voluntarily dismissed the California action and is now asserting the relevant claims as counterclaims in this Court.

Aerosonic and TransDigm move to dismiss the first, third, fourth, and fifth counterclaims. (Doc. # 109). They do not move to dismiss the second counterclaim. Joby has responded. (Doc. # 119). The Motion is ripe for review.

## II. **Legal Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), this Court accepts as true all the allegations in the counterclaim and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the

counterclaim. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a [counterclaim] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to well-pleaded factual allegations, documents central to or referenced in the counterclaim, and matters judicially noticed. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004); see also Hi-Tech Pharms., Inc. v. HBS Int'l Corp., 910 F.3d 1186, 1189 (11th Cir. 2018) ("Under the doctrine of incorporation by reference, we may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity.").

### III. Analysis

#### A. Counterclaim One

Aerosonic moves to dismiss the first counterclaim, for breach of the sales contracts, based on allegedly deficient presuit notice. (Doc. # 109). This argument fails.

As an initial matter, the Court accepts Joby's representation in its response that this claim was brought under California law. (Doc. # 119 at 3). To avoid dismissal under California law, "[a] buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach." Alvarez v. Chevron Corp., 656 F.3d 925, 932 (9th Cir. 2011) (internal citations omitted); see also Cal. Com. Code § 2607(3)(A) ("The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy[.]"). "The purpose of the notice requirement is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court." Donohue v. Apple, Inc., 871 F. Supp. 2d 913, 928 (N.D. Cal. 2012) (citing Cardinal Health 301, Inc. v. Tyco Elecs. Corp., 169 Cal. App. 4th 116, 135 (Cal. Ct. App. 2008)). "The Ninth Circuit has therefore construed Cal. Com. Code § 2607(3)(A) to require the plaintiff to show that

8

he has given the seller notice of the breach before filing suit." Id.; see Alvarez, 656 F.3d at 932 (upholding dismissal of express and implied warranty claims with prejudice where the undisputed evidence established that the plaintiffs sent a notice letter simultaneously with the complaint).

Here, Joby alleges it did provide presuit notice to Aerosonic. According to the amended counterclaim, Joby "notified Aerosonic (through its outside counsel) that Aerosonic was in breach by selling Joby defective air data probes" on June 5, 2025. (Doc. # 97 at ¶ 124). This is five days before Joby first filed its breach of contract claim against Aerosonic in the since-voluntarily-dismissed California action on June 10, 2025.

While Aerosonic argues this was insufficient notice to allow Aerosonic to inspect the air probes and cure the breach, Aerosonic has not cited a case dismissing a California breach of contract claim for which notice was provided a few days before the lawsuit was filed. (Doc. # 109 at 5-7). On the contrary, the Court has located case law holding that even three days was sufficient presuit notice. See Stearns v. Select Comfort Retail Corp., 763 F. Supp. 2d 1128, 1143 (N.D. Cal. 2010) ("Stearns does allege that she contacted Select Comfort on April 22, 2008 to complain about mold in her bed.

9

Stearns filed the instant action in state court three days after placing this call to Select Comfort's customer service. Accordingly, the Court concludes that Stearns has alleged adequate pre-suit notice." (internal citations omitted)). Nor is the Court convinced at this time that Joby's allegedly waiting two months after discovering the defect to provide notice to Aerosonic was unreasonable.

Therefore, Joby provided adequate presuit notice. The Motion is denied as to the first counterclaim.

B.  **Counterclaims Three and Four**

Joby's third counterclaim alleges that "the NDA into which Aerosonic entered includes provisions that, as interpreted by Aerosonic and TransDigm, would prohibit Joby from using the items it lawfully purchased from Aerosonic anymore ('the trade restraint'). Those items include the probes, but also a variety of critical information and other items." (Doc. # 97 at ¶ 155). "Under the trade restraint contained in the NDA, as interpreted by Aerosonic and TransDigm, Joby would also not be permitted to use the air data probes and other data and information to continue testing Joby's eVTOL and engaging in its lawful business." (Id. at ¶ 157). "The trade restraint in the NDA, as interpreted by Aerosonic and TransDigm, results in an unlawful restraint of

10

Joby's lawful business and trade practices and prohibit[s] Joby from using the products for their intended purpose." (Id. at ¶ 162). Joby provides two examples of the trade restraint: "both Aerosonic and TransDigm sent Joby cease-and-desist letters that demanded that Joby cease using any of the purchased probes and other materials for any purpose other than to evaluate a business relationship" and "Aerosonic then doubled down in the allegations in its complaint before this Court that Joby has breached the NDA by failing to 'immediately turn over Aerosonic's Proprietary Information, despite Aerosonic's repeated and express requests in writing.'" (Id. at ¶¶ 160-161).

Likewise, the fourth counterclaim alleges "Aerosonic's and TransDigm's conduct constitutes an unfair business act or practice because it violates the policy and spirit of California law and significantly threatens and harms competition." (Id. at ¶ 172). "Aerosonic and TransDigm unfairly compete with Joby by entering into an NDA that includes (as interpreted by Aerosonic and TransDigm) illegal provisions designed to prohibit Joby from using any of the items it lawfully purchased from Aerosonic anymore ('competition restraint')." (Id. at ¶ 173). Joby highlights that Aerosonic and TransDigm sent it cease-and-desist letters

11

"insisting that the NDA demands a blanket prohibition on Joby's use of purchased probes and drawings for legitimate business purposes." (Id. at ¶¶ 179-180). "Aerosonic's and TransDigm's acts of selling the probes to Joby without disclosing their prohibitive interpretation of the NDA at the time the parties were negotiating it was a material omission. A reasonable business, like Joby, would not have entered into the NDA or purchased the probes and other information if it had known that it was legally prohibited from using them to help develop its aircraft." (Id. at ¶ 190). "Aerosonic's deceptive omission of this critical information" — that Aerosonic and TransDigm interpret the NDA and sales contracts as allowing them to demand the return of purchased air probes and accompanying data — "ensured that Joby would be lured into entering these sales contracts but without any inkling that Aerosonic and TransDigm intended to use the NDA as a sword against Joby's ability to use the purchased items for their lawful business purposes." (Id. at ¶ 189).

Aerosonic and TransDigm argue that these counterclaims are barred by California's litigation privilege because the gravamen of these claims "are litigation communications." (Doc. # 109 at 9). The Court agrees.

12

"California's litigation privilege applies to any communication '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that ha[s] some connection or logical relation to the action.'" Graham-Sult v. Clainos, 756 F.3d 724, 741 (9th Cir. 2014) (quoting Mansell v. Otto, 108 Cal. App. 4th 265 (Cal. Ct. App. 2003)). "Whether a communication has some connection or logical relation to the action is determined by the subject matter or context of the misstatement, not the isolated misstatement itself." Hart v. Larson, 232 F. Supp. 3d 1128, 1137–38 (S.D. Cal. 2017) (citation and internal quotation marks omitted). "The litigation privilege applies to prelitigation communications." Next Vietnam Projects Found., Inc. v. Koster Films, LLC, 751 F. Supp. 3d 1005, 1011 (C.D. Cal. 2024) (citation and internal quotation marks omitted). "A prelitigation communication is protected, however, only when it relates to litigation that is contemplated in good faith and under serious communication." Id. (citation and internal quotation marks omitted). "Any doubt about whether the privilege applies is resolved in favor of applying it."

13

Kashian v. Harriman, 98 Cal. App. 4th 892, 913 (Cal. Ct. App. 2002).

Despite Joby's argument to the contrary (Doc. # 119 at 5-9), Joby's claims are based on Aerosonic and TransDigm's communicative conduct related to litigation. Both examples of Aerosonic's alleged restraint on trade in the third counterclaim are litigation-related communications: the cease-and-desist letters sent in anticipation of litigation and allegations included in Aerosonic's complaint in this case. (Doc. # 97 at ¶¶ 160-161). This is exactly the type of communicative conduct the litigation privilege exists to protect: a litigant's communications made in the context of judicial proceedings (or anticipation of judicial proceedings) and connected to those proceedings. See Rubin v. Green, 4 Cal. 4th 1187, 1195 (Cal. 1993) ("[W]e can imagine few communicative acts more clearly within the scope of the privilege than those alleged in the amended complaint, that is, . . . filing the complaint and subsequent pleadings in the litigation."); UMG Recordings, Inc. v. Glob. Eagle Ent., Inc., 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015) ("[T]he interference claims, to the extent premised on the cease-and-desist letter, must be dismissed pursuant to California's litigation privilege.").

14

As to the cease-and-desist letters, Aerosonic and TransDigm sent these letters in good faith because Aerosonic intended to file (and relatively soon after did file) this case based on the same allegations in the letters. See hiQ Labs, Inc. v. LinkedIn Corp., 639 F. Supp. 3d 944, 966 (N.D. Cal. 2022) ("[S]o long as LinkedIn had an intent to bring forth litigation when it sent the [cease-and-desist] letter, the underlying motivation in doing so is irrelevant, *i.e.*, any anti-competitive motivations are irrelevant."); Niantic, Inc. v. GLOBAL++, No. 19-cv-03425-JST, 2020 WL 1548465, at *4 (N.D. Cal. Jan. 30, 2020) ("[T]he communication was made in 'good faith and actual contemplation of litigation.' The cease-and-desist letter asserted allegations 'substantially similar' to those in Niantic's complaint, which Niantic filed one week later." (citations omitted)).

The fourth counterclaim likewise relies on the cease-and-desist letters and the interpretation of the NDA reflected in those letters. Joby attempts to avoid the consequences of relying on such litigation-related communications by casting Aerosonic and TransDigm's conduct for this counterclaim as including a supposedly non-communicative act: Aerosonic's omission of its interpretation of the NDA at the time the NDA and later sales contracts were

15

signed. But this evasion is unpersuasive. The alleged injury to Joby's business and competition arose only because of Aerosonic's attempt to enforce the NDA, which involves its arguing its interpretation of the NDA in litigation. See Navellier v. Sletten, 106 Cal. App. 4th 763, 772 (Cal. Ct. App. 2003) ("While it is true that the alleged fraud occurred before the counterclaims were filed [when defendant allegedly misrepresented his intention to be bound by the release he executed], it is also true that damages from the fraud were caused by the counterclaims' assertion. Thus, . . . '[defendant] is being sued because of the affirmative counterclaims he filed in federal court. In fact, but for the federal lawsuit and [defendant's] alleged actions taken in connection with that litigation, plaintiffs' present claims would have no basis.'" (citation omitted)). The mere allegation that Aerosonic silently held that interpretation at the time the contracts were signed is insufficient to avoid the litigation privilege.

In short, the gravamen of these counterclaims is litigation-related communications. See Jacob B. v. Cnty. of Shasta, 40 Cal. 4th 948, 957 (2007) ("[I]f the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the

communicative conduct. . . . Stated another way, unless it is demonstrated that an independent, noncommunicative, wrongful act was the gravamen of the action, the litigation privilege applies." (citation omitted)). The Court is mindful that all doubts about application of the privilege are to be resolved in favor of applying it. See Morales v. Coop. of Am. Physicians, Inc., Mut. Prot. Tr., 180 F.3d 1060, 1062 (9th Cir. 1999) ("California courts have given the privilege an expansive reach, . . . and held that the privilege is absolute, even if the result is inequitable . . . . Moreover, any doubt as to whether the privilege applies is resolved in favor of applying it."). Additionally, dismissal of these counterclaims furthers the purpose of the litigation privilege: "to encourage parties to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation." Edwards v. Centex Real Est. Corp., 53 Cal. App. 4th 15, 29 (Cal. Ct. App. 1997).

Therefore, Counterclaims Three and Four are dismissed as barred by the litigation privilege.

C.  **Counterclaim Five**

The fifth counterclaim seeks a declaratory judgment that "the trade restraint and the competition restraint [complained of in the third and fourth counterclaims] violates Cal. Bus. & Prof. Code §§ 16600, et seq. and 17200, et seq." (Doc. # 97 at ¶ 194). That is, this counterclaim is predicated on the same theory and facts as the third and fourth counterclaims. Thus, the Court agrees with Aerosonic and TransDigm that the fifth counterclaim is also subject to the litigation privilege. (Doc. # 109 at 2). The Motion is granted as to this counterclaim.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Counterclaim-Defendants Aerosonic LLC and TransDigm Group Inc.'s Motion to Dismiss Counterclaims (Doc. # 109) is **GRANTED** in part and **DENIED** in part. Counterclaims Three, Four, and Five are dismissed as barred by California's litigation privilege. The answer to the remaining counterclaims is due within 14 days of this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 15th day of December, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE